# THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re:<br><br>Vanderbilt Minerals, LLC,[1]<br><br>Debtor. | Case No. 26-cv-0986 (BKS) |

### DECLARATION OF SUSAN SIEGER-GRIMM IN SUPPORT OF REPLY IN SUPPORT OF MOTION FOR STAY PENDING APPEAL

I, Susan Sieger-Grimm, do hereby declare pursuant to 28 U.S.C. § 1746 as follows:

1.      I am a Partner in the Bankruptcy & Corporate Restructuring Practice Group at Brown Rudnick LLP, co-counsel to the Official Committee of Unsecured Creditors. I am admitted to practice in the courts of the State of New York and the Commonwealth of Virginia, and I am admitted to practice before the Court *pro hac vice*.

2.      Attached as **Exhibit 1** is a true and correct copy of the May 6, 2026 hearing transcript filed in the Bankruptcy Proceeding at Docket No. 582.

3.      Attached as **Exhibit 2** is a true and correct copy of the *Temporary Restraining Order Pending Argument on the United States Trustee's Motion For a Stay* filed in *In re Purdue*, Case No. 7:21-cv-07961-CM (S.D.N.Y) at Docket No. 21-1.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on May 20, 2026

 /s/ *Susan Sieger-Grimm*
Susan Sieger-Grimm

---

[1]    The Debtor is Vanderbilt Minerals, LLC (EIN 13-1432885).  The Debtor's noticing address in this chapter 11 case is 33 Winfield Street, Norwalk, Connecticut 06855.

## EXHIBIT 1

### MAY 6, 2026 HEARING TRANSCRIPT

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| IN RE: | . | Case No. 26-60110-5-wak |
| | . | |
| VANDERBILT | . | James M. Hanley U.S. |
| MINERALS, LLC, | . | Courthouse and Federal Bldg. |
| | . | 100 S. Clinton Street |
| Debtor. | . | Syracuse, NY  13261 |
| | . | |
| | . | |
| | . | Wednesday, May 6, 2026 |
| . . . . . . . . . . . . . . . | . | 2:00 p.m. |

TRANSCRIPT OF:

MOTION TO STAY PENDING APPEAL (RELATED DOCUMENTS 493 ORDER
ON MOTION TO SETTLE/COMPROMISE) FILED BY OFFICIAL
COMMITTEE OF UNSECURED CREDITORS (DOC. NO. 510)

BEFORE THE HONORABLE WENDY A. KINSELLA
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For Debtor: | Latham & Watkins LLP |
| | By:  JAMIE L. WINE, ESQ. |
| | KIMBERLY A. POSIN, ESQ. |
| | 1271 Avenue of the Americas |
| | New York, NY 10020 |
| | |
| | Latham & Watkins LLP |
| | By:  ELIZABETH MARKS, ESQ. |
| | 200 Clarendon Street |
| | Boston, MA 02116 |
| | |
| | Bond, Schoeneck & King, PLLC |
| | By:  GRAYSON WALTER, ESQ. |
| | One Lincoln Center |
| | Syracuse, NY  13202-1355 |
| | |
| Audio Operator: | Rachel Sugrue |

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311      Fax No. (609) 587-3599**

2

APPEARANCES CONTINUED:

For Independent Manager         Katten Muchin Rosenman LLP
and Sole Member of the          By:  DAN BARNOWSKI, ESQ.
Independent Special                  ROBERT T. SMITH, ESQ.
Committee:                      1919 Pennsylvania Ave., N.W.
                                Suite 800
                                Washington, DC  20006-3404

                                Katten Muchin Rosenman LLP
                                By:  MARC B. ROITMAN, ESQ.
                                50 Rockefeller Plaza
                                New York, NY  10020-1605

For R.T. Vanderbilt             Vinson & Elkins
                                By:  GEORGE R. HOWARD, ESQ.
                                1114 Avenue of the Americas
                                32nd Floor
                                New York, NY 10036

                                Lemery Greisler, LLC
                                By:  PAUL A. LEVINE, ESQ.
                                677 Broadway, 8th Floor
                                Albany, NY  12866

Official Committee of           Brown Rudnick LLP
Unsecured Creditors:            By:  JEFFREY L. JONAS, ESQ.
                                     W. LYDELL BENSON, JR., ESQ.
                                     DAVID MOLTON, ESQ.
                                Seven Times Square
                                New York, NY  10036

                                Caplin & Drysdale, Chartered
                                By:  LUCAS H. SELF, ESQ.
                                1200 New Hampshire Ave NW
                                8th Floor
                                Washington, DC  20036

For the U.S. Trustee:           Office of the U.S. Trustee
                                U.S. Department of Justice
                                By:  ERIN CHAMPION, ESQ.
                                100 State Street, Room 4230
                                Rochester, NY  14614

For United Steel, Paper and     Cohen, Weiss and Simon LLP
Forestry, Rubber,               By:  MATTHEW STOLZ, ESQ.
Manufacturing, Energy, Allied   909 3rd Avenue, 12th Floor
Industrial and Service          New York, NY  10022
Workers International Union:

3

APPEARANCES CONTINUED:

For Fidelity & Deposit          Chiesa Shahinian & Giantomasi PC
Company of Maryland and         BY:  SCOTT W. LICHTENSTEIN, ESQ.
Zurich North America:           105 Eisenhower Parkway
                                Roseland, NJ  07068

                         - - - - -

4

## **I N D E X**

| **WITNESS** | **PAGE** |
|---|---|
| DEAN R. VOMERO | |
| DIRECT EXAMINATION BY MS. MARKS | 10 |
| CROSS EXAMINATION BY MR. MOLTEN | 20 |

| **EXHIBITS** | | **ID.** | **ENT.** |
|---|---|---|---|
| | DECLARATION OF DEAN R. VOMERO | 9 | 9 |
| UCC-1 | DEMONSTRATIVE EXHIBIT | 41 | -- |

5

(Proceedings commence at 2:00 p.m.)

(Call to Order)

THE CLERK:  You may be seated.

Wednesday, May 6, 2026, 2:00 p.m. calendar, Case 26-60110, Vanderbilt Minerals, LLC, motion to stay pending appeal.

Please note your appearances for the record.

THE COURT:  We will start in the courtroom.

Counsel for the debtor.

MS. WINE:  Good morning, Your Honor.  Jamie Wine of Latham & Watkins, proposed counsel, on behalf of the debtor, and with me today is Betsy Marks.

THE COURT:  Good afternoon.

MS. WINE:  Good afternoon.

THE COURT:  Counsel for the independent manager.

MR. BARNOWSKI:  Good afternoon, Your Honor.  Dan Barnowski, Katten Muchin, on behalf of Ben Pickering.  And with me in the courtroom is Robert Smith and Marc Roitman.

THE COURT:  Good afternoon.

Counsel for the Committee.

MR. MOLTON:  Good afternoon, Your Honor.  David Molton of Brown Rudnick, now appointed counsel, no longer proposed counsel, to the Committee.  With me today is Mr. Jonas, Lydell Benson, and Lucas Self from the Caplin firm, Your Honor.

6

Thank you.

THE COURT:  Good afternoon.

On behalf of the U.S. Trustee.

MS. CHAMPION:  Good afternoon, Your Honor.  Erin Champion for the United States Trustee.

THE COURT:  Good afternoon.

Counsel for the Vanderbilt Holdings entities.

MR. HOWARD:  Good afternoon, Your Honor.  It's George Howard, Vincent & Elkins, on behalf of non-debtor R.T. Vanderbilt Holding Company and the other non-debtor affiliates.

THE COURT:  Good afternoon.

I believe we have a local counsel appearance by video with those entities as well.

MR. LEVINE:  Yes.  Good afternoon, Judge.  Paul Levine, Lemery Greisler, local counsel with Mr. Howard.

THE COURT:  Good afternoon.

MR. WALTER:  Good afternoon, Your Honor.  Also, Grayson Walter, Bond, Schoeneck & King, co-counsel for the debtor.

THE COURT:  Good afternoon.

Is anyone appearing this afternoon for Commodore?

(No audible response)

THE COURT:  Okay.  I'm not surprised.

Anyone appearing for the United Steelworkers?

MR. STOLZ:  Good afternoon, Your Honor.  Matthew

Stolz of Cohen, Weiss and Simon on behalf of the United Steelworkers Union.

THE COURT:  Good afternoon.

Anyone appearing for Twin City Fire Insurance?

(No audible response)

THE COURT:  Pacific Indemnity?

(No audible response)

THE COURT:  Pension Benefit Guarantee Corporation?

(No audible response)

THE COURT:  Okay.

Why don't we open it up for counsel for any talc claimants?

(No audible response)

THE COURT:  And we'll take appearances by video now. So anyone appearing by video for the talc claimants?

(No audible response)

THE COURT:  Is there anyone else by video who would like their appearances known?

MR. LICHTENSTEIN:  Good afternoon, Your Honor.  Scott Lichtenstein from CSG for Fidelity and Deposit Company of Maryland and Zurich North America.

THE COURT:  Good afternoon.

Anyone else for appearance by video?

(No audible response)

THE COURT:  Hearing none, we'll get started.

8

This is the Committee's motion, so let's hear from the Committee.

MR. MOLTON: Your Honor, I'm going to just flip it for some scheduling issues --

THE COURT: Sure.

MR. MOLTON: -- to my colleague from Latham.

THE COURT: Certainly.

MS. WINE: Thank you.

THE COURT: Thank you.

MS. WINE: Good afternoon, Your Honor. Jamie Wine of Latham & Watkins, proposed counsel for the debtor.

We do have some live testimony today, and so we've agreed that we would start with that and then do argument after. My colleague, Betsy Marks, is going to be handling the witness examination, so if Your Honor is okay with that, we would propose calling our witness right now.

THE COURT: Certainly. I assume the Committee's consented to that.

MR. MOLTON: We have, Your Honor.

THE COURT: Okay.

If you give us just a moment, we need to stop the video participation and we'll go to live and then we will reopen up the video participation once the testimony has concluded.

(Pause)

9

THE COURT:  Give us just one minute.

Wonderful.

Please call your first witness.

MS. MARKS:  Good afternoon.  Betsy Marks from Latham & Watkins, proposed co-counsel for the debtor.

As my colleague represented, our witness today will be Mr. Dean Vomero.

Your Honor, we also would propose to move Mr. Vomero's declaration into evidence.  That's at Docket Entry 537.

THE COURT:  Any objection?

MR. MOLTON:  Your Honor, the Committee has no objection to that.

THE COURT:  Thank you.

So admitted.

(Declaration of Dean R. Vomero admitted to evidence)

THE COURT:  Mr. Vomero.

THE CLERK:  Please come forward to be sworn in.

Please raise your right hand.  State your full name, and spell your last.

MR. VOMERO:  Dean Vomero, V, as in Victor, O-M-E-R-O.

DEBTOR'S WITNESS, DEAN R. VOMERO, SWORN

THE CLERK:  You may be seated.

MS. MARKS:  Your Honor, before we proceed, I wanted to note most of Mr. Vomero's testimony today is in support of

Vomero - Direct/Marks                    10

the debtor's opposition to the motion to stay.  Some of that testimony overlaps with the motion for sale approval, which will be heard tomorrow.

Our proposal is to elicit all of that testimony at once to be efficient, but that the testimony also be applicable to tomorrow's hearing.

THE COURT:  The Court doesn't have any objection to that.

Does the Committee?

MR. MOLTON:  Your Honor, as long as Mr. Vomero will be here tomorrow for cross examination, that's fine.

THE COURT:  Thank you.

MS. MARKS:  We can make him available.

THE COURT:  Thank you.

DIRECT EXAMINATION

BY MS. MARKS:

Q    Good afternoon, Mr. Vomero.

A    Good afternoon.

Q    You are the debtor's chief restructuring officer?

A    Yes, I am.

Q    How long have you been the debtor's chief restructuring officer?

A    Approximately a year.

Q    And given that you've testified several times before the Court, I'm not going to ask you again about your background.

Vomero - Direct/Marks                           11

But what is your understanding of why you are here today?

A   To support the sale and the DIP continuing and going through.

Q   And before we talk about the sale, I'd like to ask you some questions about where the debtor started at the outset of its restructuring process.

Pre-petition, did the debtor conduct a marketing process?

A   Yes, it did.

Q   And what was the purpose of that process?  What was the debtor marketing?

A   The debtor's assets.

Q   Was the debtor also looking for DIP lending?

A   It was.

Q   And tomorrow, we'll hear more from Mr. Mendelsohn, the debtor's investment banker, on the marketing process.  But at a high level, what was the end result of the debtor's pre-petition marketing process?

A   So a stalking horse agreement for a headline price of $50 million and a $15 million DIP facility.

Q   What assets were included in the sale contemplated in the stalking horse agreement?

A   So it was the debtor's assets and what we're referring to as the settlement assets.

Q   And can you describe generally what are the settlement assets?

A     So mineral rights for Lyle's Mine, which we refer to as Lyle's Mine, operating equipment in Gouverneur, which is the Netzsch Mill, and a processing facility in Murray, Kentucky, which we refer to as the VEEGUM plant.

Q     Was the stalking horse bidder interested in purchasing the debtor's assets alone without the settlement assets?

A     No.

Q     Were there any other potential buyers during the marketing process who submitted an indication of interest who were interested in the debtor's assets without the settlement assets?

A     No.

Q     As chief restructuring officer of the debtor for the last year, have you become very familiar with the debtor's business?

A     I have.

Q     And what is your understanding of why potential buyers who are interested in purchasing more than just a small subset of the debtor's assets require that the settlement assets be included in any transaction?

A     Yeah.  So I think if you look at it from a business perspective, which is how I view what's occurred here, so if you start in New York with the Netzsch Mill, it's actually operating equipment that's essentially integrated into that facility.  So it was sort of a natural.  Like, nobody's going to want to lease that equipment.  It just seemed like a

natural, in my mind.

I think what's been underrated in all of this is the mineral rights of Lyle. So you have unique mineralogy, and that mineral goes into formulas to make our VEEGUM products. Very difficult to replace, if you can replace it. It's expensive, time-consuming because of certifications.

And then you look at the VEEGUM plant. And one of the things I did when I started, I'm like, all right, can we out source this? Is there somebody else that can make the same requirements that we have?

A, potentially a competitor could, but they wouldn't have had the amount of available capacity to meet our demand. So that's kind of the baseline. So if you look at it coming in, it's a huge risk from a buyer on the supply chain.

The second piece is the business play, right. So 42 percent of our revenue is international. We have one person, one salesperson that manages that vast network. So as part of a business plan, if you had capital available to invest in the business, you would expand that sales force out.

In doing so, one of the issues would be, at the time we thought we only had about 300,000 to 500,000 pounds of capacity to sell the VEEGUM. As you build out the sales force, you then in turn run into a capacity issue. You won't have capacity to service the market.

In order to do that, you have to eliminate the bottleneck

Vomero - Direct/Marks                14

at (indiscernible), which is in the middle (indiscernible) sort out impurities, and it's about $5 million to do that.

So from a business perspective, if you were going to grow it, it made logical sense.  So that's my view.

Q    Okay.  Post-petition, did the debtor continue to engage with potentially interested buyers, including the stalking horse bidder?

A    Yes.

Q    Did any new buyers emerge who were interested in purchasing substantially all of the debtor's assets without the settlement assets?

A    No.

Q    Did the debtor hold an auction?

A    It did.

Q    And when was that?

A    Monday.

Q    Who was the winning bidder at the auction?

A    Riverspan.

Q    What was the amount of Riverspan's winning bid?

A    $64 million headline price.

Q    And how much higher than that is the purchase price in the stalking horse agreement?

A    $14 million.

Q    Did Riverspan's bid include the settlement assets?

A    Yes.

Vomero - Direct/Marks                              15

Q    Were there other bidders at the auction besides Riverspan?

A    Right Lane and one other bidder for a small parcel of land.

Q    And Right Lane is the parent entity of Commodore, the stalking horse bidder?

A    Correct.

Q    What was Right Lane's bid?

A    62.4.

Q    And is Right Lane the backup bidder?

A    They are.

Q    Did Right Lane's backup bid also include the settlement assets?

A    It did.

Q    At the auction, were there any bids for substantially all of the debtor's assets that did not include the settlement assets?

A    No.

Q    And you touched on this earlier, but as Chief Restructuring Officer, why do you believe the settlement assets are critical to a sale of the debtor's business?

A    (Indiscernible)

        MR. MOLTON:  Objection.  Asked and answered.  I thought we had that answer.

        THE COURT:  I'll sustain that.  I believe that's correct.

Vomero - Direct/Marks                    16

BY MS. MARKS:

Q    Why don't I ask it this way?  Do you believe that the assets are critical to a sale?

A    Yes.

Q    And why is that?

A    It was a requirement of our bidders and a sale won't go through without them.

Q    If a stay of the settlement order is granted pending the Committee's appeal, will the debtor's parent transfer the settlement assets to the debtor?

A    No.

Q    Will Riverspan close on the sale if the Committee's stay is granted and the assets are not transferred?

A    No.

Q    If there's no stay, do you have an understanding as to whether the parent has agreed to transfer the settlement assets to the debtor even if an appeal is pending?

A    Yes, they will.

Q    If there's no stay, will Riverspan agree to close even if an appeal is pending?

A    Yes.

Q    If the settlement order is stayed pending the Committee's appeal, what would the effect on the sale be?

A    So, first, you would, I think, most importantly, it means you'd lose your financing and your ability to finance the

Vomero - Direct/Marks                17

business.  You, of course, lose the sale proceeds.

Then there's the fact immediately on our supply base, you could easily see a run on suppliers, tightening credit terms, further forcing liquidity demands, diminishing liquidity.  And, of course, you certainly increase the probability that customers depart.  Certainly not good news.

Q    What would the impact be on the debtor's 126 employees?

A    So the risk, you know, the risk of unemployment is heightened significantly in this situation.

Q    If the resolution of this Chapter 11 case is delayed, what would the effect be on the debtor's creditors and the talc claimants?

A    There would be a significant diminution in value here.

Q    Do the debtors even have enough liquidity to fund the Chapter 11 case pending an appeal if the settlement order is stayed?

A    So we probably have four to six weeks of liquidity without maybe some significant Draconian measures.  A couple more weeks beyond that, but.

Q    Okay.  And let me just ask you a little more about that.

What was the debtor's cash position as of the petition date?

A    It was about 1.3 million, approximately.

Q    And what did the debtors borrow in interim funding under

Vomero - Direct/Marks                    18

the existing DIP facility?

A    8.5 million.

Q    What was the debtor's cash balance as of the end of last week?

A    Slightly under $3 million.

Q    What is the debtor's cash burn weekly, approximately?

A    Just, so we've been in bankruptcy about 10 weeks.  We've borrowed about 8.5 million, so plus or minus, gets you to 800,000 a week, more or less.

Q    Are the debtor's operating revenues sufficient to cover its ongoing expenses in Chapter 11?

A    No.

Q    Without the sale proceeds and additional DIP funding, how long can the debtors continue to operate?

A    Again, it's probably four weeks as I see it today, without taking significant risk, and Draconian measures can perhaps extend it a little longer.

Q    And what if the debtor did take significant risk and tried to stretch and trim its costs, how long do you think it could continue to operate in a best-case scenario?

A    Eight weeks, best-case.  Maybe six.  It's hard.  It's hard.  It's difficult to predict.  But it's uncomfortable.  You don't, you know, from my perspective, our payroll is about a million dollars a month.  You really don't want to go below that number, and I would.  I can answer that.  So that's just a

Vomero - Direct/Marks                    19

general rule to follow (indiscernible).

Q    If the sale does not close the debtor does not collect the sale proceeds or additional DIP financing, what would happen to the debtor's ability to operate as a going concern?

A    It's a significant risk.  It's probable that we will not be able to continue as a going concern.

Q    And based on your experience, does the sale to the winning bidder represent the best available path to maximize value for the estate?

A    Yeah, absolutely.

Q    When do you believe the sale needs to close?

A    As soon as possible.

Q    And why is that?

A    There's been tremendous diminution in value right now. We've borrowed $8.5 million for professional fees.  This needs to end right now.  I think we are putting employees at risk.  We're putting customers at risk.  We're putting suppliers at risk.  I'm absolutely not comfortable where we are right now.

Q    Okay.  Thank you.

          MS. MARKS:  No further questions at this time.

          THE COURT:  Thank you.

          MR. MOLTON:  May it please the Court.

          THE COURT:  Certainly.

          MR. MOLTON:  Thank you.

Vomero - Cross/Molton                          20

CROSS EXAMINATION

BY MR. MOLTON:

Q    Good afternoon, Mr. Vomero.

A    Good afternoon.

Q    Good to see you again.

A    Good to see you again.

Q    Just a few things before I get to my question.

        MR. MOLTON:  First of all, Your Honor, I just want to note for the record, again, that I'm going to be crossing him principally on the issues dealing with the stay motion.

        THE COURT:  Okay.

        MR. MOLTON:  and I'm going to leave it to Mr. Jonas. Unfortunately, I can't be here tomorrow, but Mr. Jonas will, and he'll be able to do cross on some of those issues.

        THE COURT:  Certainly.  Thank you.

        MR. MOLTON:  Thank you.

BY MR. MOLTON:

Q    You just gave me a parade of horribles that might happen based on your experience.  You've been in restructuring a long time, haven't you?

A    I have.

Q    And you've heard many people talk about parade of horribles before in court and otherwise, right, if something doesn't happen?

A    David, I have, but not this extreme, I have to say.

Vomero - Cross/Molton                          21

Q     But all I'm asking you is, yes or no.  You've heard people talk about parade of horribles.

A     Just generally.

Q     Okay.

And what you're telling the judge right now is what you think might happen, correct, based on your experience?  And I'm not undermining your experience.  Am I right?

A     No, actually, I think what's likely to occur.

Q     Yeah, I get it.  But --

A     But we're talking about a future outcome.

Q     Yeah.

A     And I think it's more likely than not that the (indiscernible).

Q     But you've also been in restructuring enough to know how resourceful and innovative people are when things happen to either extend work deals, allow things to happen.  You've seen that before, right?

A     I have seen that when you have adequate capital to do it.  We have 3 million of business.  I think we're playing with (indiscernible).  I just don't think there's enough safety-net --

Q     Okay.

A     -- here, David.

Q     But, again, Mr. Vomero, what you're talking about is what you think might happen.  You don't know what will happen,

Vomero - Cross/Molton                           22

correct?

A    I'm a pretty experienced professional, as you acknowledged.  This is more uncomfortable than I've seen in the past.

Q    Okay.

A    In my opinion.

Q    And we'll get to that issue in a minute.

You are a restructuring expert, are you not?

A    I don't know if I'm an expert, but.

Q    Well, you've been at this field a long time.

A    I've been doing it for a while.

Q    Right.

I imagine you keep up with the big issues in the field as well, right?

A    Not really, actually.  On the bankruptcy side, I don't really.

Q    Okay.  We've heard that the parties to the settlement agreement are waiving their requirement for a final non-appealable order approving the settlement agreement as a condition to its effectiveness.  Is that correct?

A    That's correct.

Q    And when did that happen?

A    I don't know the precise time, but within, I would say, the last three days, two days.

Q    And that resulted from the fact that the Committee has

Vomero - Cross/Molton                    23

filed a notice of appeal of Her Honor's approval order, correct?

A    I actually don't know, David, the mechanics.

Q    The settlement agreement requires that such waiver be in writing and signed by all the parties.  Am I right?

A    David, I don't know (indiscernible).

Q    Okay.  Today, we saw on the docket a notice of waiver. Did you see that?

A    I did not see it, but I was informed by counsel.

Q    Okay.  Have you read it?

A    I have not read it.

Q    Okay.

     The settlement agreement also provides Mr. Pickering with what we call a fiduciary act.  Is that correct?

A    That's my understanding.

Q    And do you know what a fiduciary act is?

A    So, just generally, if he feels there's a reason for him to back out of the deal, he can.

Q    Okay.  Has that been waived by Mr. Pickering?

A    I don't believe it has.

Q    Are you aware that -- well, again, I just scanned the settlement agreement.  Would it refresh your recollection if I tell you that the waiver agreement that was filed today suggests that Mr. Pickering will be waiving his fiduciary out upon the occurrence of the closing of the sale?

Vomero - Cross/Molton                          24

A    That's the first I've heard.

Q    That's news to you?

A    That's news to me.

Q    Okay.

Are you aware of the date the parties have chosen as the last day to close the sale?

A    David, that date has moved around.  As I sit here today, I can't remember specifically.

Q    If I tell you that, at least in what I've seen from my friends at Latham, when they tell me I should go into the data room and I don't know how to do that, to tell you the truth. But in any event, I get what I can get.

I understand it's June 23, 2026?  Does that ring a bell?

A    About the last week of June, I think there's been discussion of trying to do that sooner.

Q    Okay.

A    But I don't know if --

Q    And in the APA, the APA, I'm going to use APA, that's Asset Purchase Agreement, you understand that, right?

A    I do.

Q    Okay.

In its original form that was filed early in this case with the Court, is it correct that the last date to close was 60 days following the petition date?  Does that ring a bell?

A    It actually doesn't ring a bell.  That's a date I have not

Vomero - Cross/Molton                           25

worked with.

Q    Okay.  So you're not aware that, as originally presented to this Court, the date to close or else parade of horribles would have been 60 days from February 16th, which would have been mid-April.

A    Oh, sorry, when you're going back to the original APA?

Q    Yeah, yeah.

A    (Indiscernible)

Q    Am I right?

A    It doesn't surprise me at that point in time.

Q    Okay.

     And you're familiar with the term three-legged stool, a term that debtor's first counsel, Ms. Lennox, used at the first-day hearing, are you not?

A    I am.

Q    You understand that to mean the DIP financing motion, the settlement approval motion, and the sale motion.  Am I correct?

A    Correct.

Q    Okay.

     So under the three-legged stool's construct and plan, is it correct that everything was intended to be done in this case by mid-April 2026 or else a parade of horribles would follow?

A    That was the initial plan.

Q    Thank you.

     And that would have been a very short time, would it not,

Vomero - Cross/Molton                    26

from when my Committee was first appointed and retained counsel, am I correct?

A    Yes.

Q    Very short period of time.

A    Very short period.

Q    Very short period of time.  Thank you.

And as we heard, this three-legged stool was interdependent on each leg of it, so to say.  Am I correct?

A    Yes.

Q    That's what we were told, right?  And if you read it, it kind of feels that way.

Okay.  Meaning if there was a problem with what, let's say, the settlement agreement and its approval by Her Honor, that would forestall under the three-legged stool concept, the sale from being consummated.  Am I correct?

A    That's my understanding.

Q    Yeah, mine, too.

And that was a feature of the three-legged stool if one didn't gain approval by the Court if you -- I'm going to withdraw that question.

And the feature of the three-legged stool, am I correct, is if that you didn't get approval from the Court for one of the legs, the whole stool fell, right?

A    That's the way it was designed.

Q    Yeah, that's the way it was constructed, right?

Vomero - Cross/Molton                    27

A    Mm-mm.

Q    Okay.

And that structure was agreed to by the debtor before the petition was filed, correct?

A    Yes.

Q    And it was agreed to by Holdings before the petition was filed.  Am I correct?

A    What leg of the stool?

Q    The structure.

A    The structure (indiscernible).

Q    The three-legged stool.

A    I don't think Holdings approved the APA or the DIP.

Q    Okay.

A    I think it was just the settlement.

Q    Just the settlement.  Okay.

A    That's my understanding.

Q    But the debtor approved it.

And that was the structure, the three-legged stool was the structure that the debtor asked this Court to approve starting from day one of this case, correct?

A    Yeah, that's right.  In our view, it was the fastest way to maximize value.

Q    I get it.

Before I leave the deal agreements and the APA, am I correct, the APA does not guarantee that all the workers of the

Vomero - Cross/Molton                              28

debtor that you just talked about will be employed post-sale?
Am I correct in that?  It doesn't guarantee that?

A    I wouldn't know, but I expect that.

Q    Thank you.

Indeed, it provides specific provisions that allow for termination.  Am I correct?

A    That's pretty common because, typically in an asset sale, you will terminate employees of the debtor and then rehire them the next day, so I'm not alarmed by that.

Q    Okay.  Thank you.

A    I can't say that I'm not aware of any mass layoffs or terminations at this point.

Q    The estate releases.  We'll move on.

A    Okay.

Q    The estate releases were always part of the three-legged stool.  Am I correct?

A    It's part of the settlement.

Q    Settlement Agreement, which is part of the three-legged stool.

And when I call it estate releases, I'm not just referring to release of simple intercompany claims, accounting things, whatever.  Talking also is explicitly written in that release, alter ego, successor liability, product line claims, correct?

A    Okay.

Q    And that was always part of the settlement agreement was

Vomero - Cross/Molton                                    29

it not, between the parent and the debtor.  Am I right on that?

A    I actually can't answer that question.  I wasn't that close to the release component of the settlement.

Q    I understand there was a special manager who had special counsel, but I presume as Chief Restructuring order, you had visibility as to the documents that were being produced and to be filed in this Court, correct?

A    Not necessarily, David.  But I will say this.  My understanding was, at the onset, that the parent wanted a clean slate, but the specifics of the releases and the mechanics and the types was not anything (indiscernible) --

Q    And when you say a clean slate, you mean a clean slate of asbestos liability with respect to those claims, correct?

A    I think they wanted to operate their business and focus on their business.  That was my interpretation.  But I'm certainly not qualified to judge the whole release portfolio.

Q    Okay.  Well, with respect to the releases and them being part of this even before the petition date, we saw, remember your November 9, 2025, email that Mr. Jonas showed you?

A    Yeah, yeah.

Q    Where you wrote to Mr. Pickering?

A    Yeah.

Q    You wrote to Mr. Webster, he was with Holdings, right?

A    Yeah.

Q    And Mr. Orpilla, who was with Holdings, right?

Vomero - Cross/Molton                                30

A     That's right.

Q     And you specifically mentioned as one of the items on the agenda, the VM, which I presume is Vanderbilt Minerals, right?

A     Yeah.

Q     Release, right?

A     Right.

Q     That's the estate claim release, right?

A     Well, like I said before, they wanted a clean slate.  I specifically didn't know what it meant.  In fact, at the time when I wrote it, I was thinking, all right, is it the director's minerals that get to release?  It was, my understanding was they wanted a clean slate, and I just wanted to make sure that the parties understood what the other wanted.

Q     And you --

A     (Indiscernible) to fight about that many times.

Q     I don't want to --

A     That's all I was trying to do, David, in that instance.

Q     Sure.

      And, Mr. Vomero, you wrote creditor scrutiny in connection with that, correct?

A     That's right.

Q     And by creditor scrutiny, didn't you understand that this particular issue of a VM release would elicit resistance and pushback from creditors that were affected by that release?

A     It was a whole -- it wasn't so much -- actually, I wasn't

Vomero - Cross/Molton                          31

thinking about the release, I was thinking of the consideration that would have been transferred in historical transactions. They were subject to scrutiny.

Q    Yeah.

A    They needed to make sure they did their job --

Q    Did you --

A    -- and got their value.

Q    Did you --

A    That's what I was thinking about.

Q    And did you understand that that scrutiny might come, especially, from asbestos claimants, who made up the largest body of the debtor's creditors?

A    Yeah, I thought -- that's right.

Q    Thank you.

A    And I wanted to make sure that they understood that and did right away.

Q    And so, as of November of 2025, a few months, an eternity from the Committee's point of view, a few months, but just in terms of our role in this case so far, you knew that there was going to be offered in one leg of the three-legged stool, a release that would elicit response from the creditors, specifically the asbestos.

A    Now, it wasn't about the release.  From my perspective, it was about the value, right.  So, to me, this was always about value, and so I wasn't -- like, again, David, like, in my

experience, release is like a standard thing in a deal.  I was mostly concerned about value that the estate was getting, 100 percent.

Q    And being in the restructuring world at this time, in November 2025, weren't you aware of the fights and litigation that was going on nationally over this particular issue of what is an estate claim in other bankruptcies?

A    David --

MS. MARKS:  Your Honor, at this point, I would object.  I would like the witness to be able to finish his answers without being cut off.  But I would also argue that this is not really relevant because the stay has already been covered and --

MR. MOLTON:  No.

MS. MARKS:  -- (indiscernible)

MR. MOLTON:  Judge, I would say it's very relevant because the balance of hardships and the irreparable injury that they say, there's a case law, which I'm going to get to in a very short time, that says if they manufactured their own hardship and they took steps that caused their own hardship and they put in a structure that resulted in now the claim parade of horribles, that's relevant to the stay motion.

THE COURT:  The Court will overrule the objection on that particular aspect.  But please allow the witness to answer the question.

Vomero - Cross/Molton                                      33

MR. MOLTON:  Okay.  Thank you.

THE WITNESS:  Is there a question.

BY MR. MOLTON:

Q    I'll have to repeat it.  I'm sorry, Mr. Vomero.

You were aware, were you not, at this time, in restructuring of the headline fights going on all over the country on this particular issue?  Am I right?

A    No, not really.

Q    Not really?

A    Yeah, it was not -- this is my first foray into this (indiscernible).

Q    So this is your first rodeo (indiscernible)?

THE COURT:  Excuse me.

MR. MOLTON:  Oh, I'm sorry.

THE COURT:  Counselor, please allow him to finish.

THE WITNESS:  So I was not intimately knowledgeable on those issues.

BY MR. MOLTON:

Q    Okay.

Was it a surprise?  It wasn't a surprise to you, was it, when the asbestos claimants and representatives and a committee was constituted that decided to resist specifically, not necessarily a settlement with a contribution of assets, but one that had to include a release of estate claims that included successor liability claims?

Vomero - Cross/Molton                                        34

A     I would have expected any constituency to evaluate it frequently.

Q     Okay.

      In your first-day motion, Mr. Vomero, you stated that you came to debtors in early 2025?

A     Yes.

Q     Okay.  And you came there, I think, and I'm paraphrasing you, to assess strategic alternatives in addressing mounting talc-related litigation costs and jury verdicts, correct?

A     No, not necessarily.  My first retention with the debtors, David?

Q     Yeah.

A     Was May.  So that would have been May, as CRO.

Q     Okay.  Well, I understand, but --

A     Just like, because of the (indiscernible), just want to be clear.

Q     Paragraph 8 of your first-day, maybe this will refresh your memory.

      Hold on a minute.  Maybe it's not Paragraph 8.

      Yeah.  Here we are, Paragraph 8.

      "In 2025, the debtor with my assistance commenced a comprehensive assessment of strategic restructuring alternatives to address mounting talc-related litigation defense costs and jury verdicts and stabilize operations."

      Correct?

Vomero - Cross/Molton                               35

A     That's correct.  I was just clarifying the timing.

Q     And you also mentioned in this declaration that you submitted to Her Honor on the first day that you concluded that debtor was cash positive absent growing costs of talc related litigation, correct?

MS. MARKS:  Your Honor, I think I would ask for the document to either be provided to the witness or that it not just be read.  It should be sort of standalone questions.  There's (indiscernible).

THE COURT:  The Court agrees.  I sustain that objection.

MR. MOLTON:  Here, can I hand you the document?

THE COURT:  You may.

MR. MOLTON:  Your Honor, just for the record -- I'll talk into the mic.  I'm sorry.

This is in this case, Document 19 entered on February 16, 2026.

THE COURT:  Certainly.  And that, I believe, is already in the record on multiple --

MR. MOLTON:  It is in the record.

THE COURT:  -- multiple other --

MR. MOLTON:  Repeatedly.

THE COURT:  Yes.  So, certainly.

MR. MOLTON:  Just for the record, I just highlighted it, so.

Vomero - Cross/Molton                    36

MS. MARKS:  I would just want the witness to have a chance to see it if you want to ask him about what it says.

THE WITNESS:  What would you like me to read?

BY MR. MOLTON:

Q    Just Paragraph 8 in full.

A    Okay.

Q    And tell me when you're done.

(Witness reading paragraph)

A    So, just the Paragraph 8 --

Q    Yeah.

A    -- that's all?

Q    Yeah.

A    Yeah, okay.

Q    Thank you, Mr. Vomero.

So, again, am I correct that you stated in your affidavit that the debtor was cash positive?

A    Yes.

Q    Absent growing costs of talc related litigation, correct?

A    Correct.

Q    Okay.  And so if that talc related litigation was paused, the debtor would continue to be cash positive, am I right?

A    No.

Q    Tell me why.

A    Restructuring costs.  Bankruptcy costs.

Q    I'm saying, before we step into this world of bankruptcy,

if that litigation -- my question was, if those costs and litigation were paused, paused, forget about whether you're in bankruptcy.  Assume for my question, you're not.  Debtor still would have been cash positive going forward.

MS. MARKS:  Objection.  Calls for speculation.  Hypothetical.

MR. MOLTON:  We've heard a lot of that, today.

THE COURT:  Overruled.  You may answer that.

THE WITNESS:  Yeah.

So, if the cash requirements, the cash drained from talc-associated obligations when away, they would have been cash-flow positive.

MR. MOLTON:  Yeah.

BY MR. MOLTON:

Q    Other than the three-legged stool, did you consider any other strategic alternatives?

A    I did.

Q    Okay.

And which ones did you consider?

A    So, first I looked at standalone.

So, we built a comprehensive business model that went out bi-month through 2026, and then annually beyond that, starting with 2022 bi-month historical.  So, I modeled various scenarios in terms of what a free cash flow would be and what level of claims they could support too risky under that scenario.

Vomero - Cross/Molton                                    38

The second thing we looked at is there are, and it's in Greenhill's retention letter that I put in there, there's a universe of liability management funds who will, in essence, take over the business if there's a backstop, typically by a parent.  That's my first foray into that.  We evaluated that.

The third was the historical legacy insurance policies have value.  So we evaluated potentially cashing one of those in to try to continue to go on longer.

I did a high-level liquidation analysis to say that the indications should we liquidate.  Is that better?  So, those were the things I considered at various points in time.

Q    And was that liquidation analysis produced in this case?

A    I didn't finish it.  So, I don't know.

Q    I don't think I've ever seen it.  Okay.

A    It wasn't a -- it was really just looking at the valuations that we have done so it was more of a (indiscernible).

Q    You understand that there are times when the asbestos bar, the firms, are approached by a company pre-bankruptcy and consensually agree to a prepack to pause the litigation and solve the problem.  Am I right?

A    Counsel --

Q    You're aware of that.  Am I right?

THE COURT:  Could --

MR. MOLTON:  Okay.  I'm sorry.

Vomero - Cross/Molton                          39

THE WITNESS:  I was going to say (indiscernible) so that would have been in the hands of legal counsel, David, and that did come up in discussions.

BY MR. MOLTON:

Q    Was any overture ever made to any of the law firms that were involved in suing the debtor to engage in those negotiations pre-bankruptcy and seek to get to a prepack?

A    No.  There were no -- not to my knowledge, David.

Q    Thank you.

By the way, did debtor ever ask Holdings to drop its requirement that Alter Ego Successor Liability Estate claims be removed from the release in the settlement agreement in order to eliminate the resistance and creditor scrutiny that you stated you weren't surprised came?

A    I'm not aware of it.  I wouldn't know if either that would be subject to the independent committee.

Q    But as far as you know, that never happened, right?

A    I don't know.

Q    As far as you know.  Your knowledge.

A    I don't know what I don't know.

Q    I get it.

Do you know whether Holdings ever offered to do that?

A    I don't know.

Q    Okay.

By the way, in your first-day declaration, you noted that

Vomero - Cross/Molton                    40

debtor had received and rejected a stand-alone DIP financing. Am I right?

A     That's right.

Q     So there was available to you stand-alone DIP financing, correct?

A     David, there were -- I would prefer that to be asked of Eric.  There were complications associated with it, and I can't remember at this time the background associated with that.

Q     Okay.

A     But there were, it's just I can't recall.

Q     Do you know -- one second.  Excuse me.

     Mr. Vomero, you mentioned that the sale price from the top bidder was $64 million, right?

A     Correct.

Q     Have you done a simple, or not simple, or back-of-the-envelope analysis of what the net sales proceeds will be to debtor?

A     No, I haven't.

Q     We've tried to put one together, and this I'm just offering for illustrative purposes as a demonstrative, so.

          MR. MOLTON:  Your Honor, can I?

          THE COURT:  You may.

          MR. MOLTON:  Can we mark this as Committee 1?

          THE COURT:  You may.

          MR. MOLTON:  I probably will not be moving this into

Vomero - Cross/Molton                                    41

evidence.

MS. MARKS:  I would object to it be put into evidence.

MR. MOLTON:  Well, I just --

MS. MARKS:  You need a demonstrative.

MR. MOLTON:  Anybody else?

BY MR. MOLTON:

Q    Could you take a look at it?

MS. MARKS:  Your Honor, I would just note for the record that we had (indiscernible) not seen this in advance.

THE COURT:  Understood.

Ms. Johnson, would you please make sure you do UCC-1 since we have other Committees that were -- this is Creditor's Committee proposed Exhibit 1.

MR. MOLTON:  Okay.

THE CLERK:  UCC Exhibit 1 marked for identification purposes.

(UCC Exhibit 1 marked for identification purposes)

BY MR. MOLTON:

Q    In your declaration filed yesterday, you noted that the $64 million auction winning bid, and you said in it, and I'm quoting you, "Without the proceeds from that sale, the debtor had no real" -- I'm probably skipping.

"The debtor would be unable to provide the talc claimants with a meaningful recovery on their claims."

Vomero - Cross/Molton                                42

Do you remember writing something like that?

A    Yes.

Q    And that's Paragraph 14,j 13, rather.

And I'll read it in full just because I think I chopped it up a little.

"Without the proceeds from the sale, the debtor had no realistic path to satisfy its obligations to creditors and to provide the talc claimants with a meaningful recovery on their claims."

Have you gone through the line items here?

A    I have.

Q    Are they kind of -- I mean, this is all back-of-the-envelope stuff that we tried to --

A    Plus or minus.

Q    Yeah.  I did this.  Does it look kosher?

A    Yeah, it looks kosher.

Q    It looks kosher.

And I won't waste the time of going through them.  I think they're very self-explanatory.

So if this is kosher, we're looking at net proceeds of $39 million.  Am I correct?

A    That's correct.

Q    And that --

A    (Indiscernible) the alternative?

Q    Well, I --

Vomero - Cross/Molton                        43

A    Okay.  Sorry.

Q    I try to follow the rules.

A    All right.  All right.  I gotcha.  I gotcha.

Q    Okay.

MS. MARKS:  Your Honor, the witness has never seen this before and has not had the opportunity to do this math.  I also don't know if he's the appropriate witness compared to Mr. Mendelsohn who will be here tomorrow.

So I would object to any testimony about what these numbers mean.

THE COURT:  I think counsel's made it clear it's a back-of-the-envelope and certainly can be solidified tomorrow with Mr. Mendelsohn of Greenhill.

MR. MOLTON:  We heard a lot of numbers analysis today from your witness.  I'm sure he's comfortable with this.

BY MR. MOLTON:

Q    But going forward, that comes out, you're aware there's about -- and this doesn't include, I think, continued administrative expense of this case going forward.  So that might eat into that $39 million.

If you take the 1,400 known mesothelioma claimants and just for the sake of it, presume this all goes to a trust, which it likely won't, and presume there are no costs to that trust, which probably is another incorrect assumption.  But assuming those things, that comes out to about $28,000 per

Vomero - Cross/Molton                    44

asbestos claimant.

Am I correct?

A    I'll take your word for it.

Q    To you, in your fiduciary duties to the claimants, is that a meaningful recovery of the talc claimants' claims?

A    Compared to the alternatives, it is.

Q    Okay.

A    Compared to the alternative.  And I think in your analysis, there is extensive amount of insurance proceeds out there.  So I don't think you're comparison is (indiscernible).

Q    Yeah, but we're talking about the sale, and we're talking about the (indiscernible).  Okay.

A    But compared to the alternative, David.

Q    I'm not going to argue with you, Mr. Vomero.  We'll leave that for a few minutes with the Court.

A    Fair enough.  Fair enough.

Q    Thank you.  I appreciate it.  Always a pleasure.

A    Thank you, David.

        MS. MARKS:  No redirect, Your Honor.

        THE COURT:  Thank you.

        You may be excused.

                    (Witness excused)

        THE WITNESS:  Thank you, Your Honor.

        MR. MOLTON:  Are we done with your evidence?

        MS. WINE:  Your Honor, we have no more witnesses for

45

today.

THE COURT:  Thank you.

MR. MOLTON:  Your Honor, I don't think we offered up on our motion for a stay pending appeal anything new other than record cites that are already in the record.  So I've got nothing to offer other than relying on the record cites as our evidence.

THE COURT:  Thank you.

MR. MOLTON:  May I?

THE COURT:  You may.

MR. MOLTON:  Okay.

Your Honor, may it please the Court.

THE COURT:  Yes.

MR. MOLTON:  My name is David Molton of Brown Rudnick, as you know, Your Honor, co-counsel to the Official Committee of Unsecured Creditors.  And, again, with me is my partner, Jeff Jonas, my colleague, Lydell Benson, and also with me from the Caplin firm, our good friends, is Lucas Self.

I'm sure we might have Committee members.  I know that they were all juxtaposing their schedules because --

THE COURT:  Oh, I'm sorry.  Excuse me.

MR. MOLTON:  -- they understood their might be testimony.

THE COURT:  Yes, Mr. Molton.  If I can, we need, before we shift into the oral argument.  We can reopen this for

46

participation.

Are we ready?

THE CLERK:  Yes.

THE COURT:  I'm sorry.  Please continue, Mr. Molton.

MR. MOLTON:  Sure.  Thank you, Judge.

I'm going to give some remarks, Judge, and I anticipate trying to respond to everything that came in yesterday from the debtor, the parent, and the special manager. If I miss something, I miss something, but so be it.  I think this covers it all.

And, also, Judge, I do have some cites for you based on what we saw yesterday, and I could do it two ways.  I'll go through it maybe.  But what I'll do, if Your Honor gives me permission to, is at the end of the day, I can have those cites put on a piece of paper and sent to you.  If Your Honor wants more, I'll put them on the record now.

THE COURT:  We should have them on the record.

MR. MOLTON:  Okay.

Judge, the settlement order entered by this Court last week has been represented by the debtor and its parent as an avenue to save the debtor's business and its 120 employees' jobs.  But, Judge, its impact will be felt forever by the 1,440 asbestos claimants in this case suffering or whose diseased loved ones had suffered horrible disease and must now face the reality that their claims against the debtor's affiliates and

47

parents, which claimants indisputably owned to the minute before this bankruptcy was filed, have been eviscerated or released without their consent and over a deliberately accelerated 60-day sprint compelled by a structure of the debtors, the special managers, and the debtor's parents and affiliates, careful, months long, if not more, own deliberate making, that, but for the intervention of the United States Trustee and certain asbestos claimants in the early days of this case, and Your Honor's own nudging, would have been compressed even further.

As Your Honor heard from the undisputed testimony of the Committee's expert, the magnitude of the asbestos liability over a conservative 30-year time period is approximately half a billion dollars.  Judge, a perusal of the objections filed yesterday urges you to consider and treat this case as almost a run-of-the-mill commercial case with run-of-the-mill commercial issues and a Committee who simply can't appreciate the value additive attributes of their three-legged stool construct. Your Honor can see that this case is anything but that.

Simply put, judge, and I submit it's an extraordinary case, a first of its kind, a prepack, yes, a prepack, of novel and ominous nature, where a 9019 settlement purporting to release for a non-debtor parent's benefit for zero consideration -- remember the testimony that he gave zero worth to those claims -- the successor claims of 1,400 asbestos

48

claimants, real people, was orchestrated under and finalized before this case was filed. That's what the evidence shows.

At a time when even my friends could not dispute, as I said, that the claimants themselves held these claims. So they were negotiating claims they didn't even own at that point in time, and they had no right to at that time. Thereby, and at that time, the claimants were entitled to run them in the civil justice system before, as constitutionally mandated, a jury of their peers.

All of this was orchestrated under the backdrop of principal restructuring counsel no longer in this case, who was for much of the pre-bankruptcy runway on both sides of the table, representing parent and debtor. To accomplish what I call this claim-taking, Section 9019 prepack, another novel tool was deployed to keep the stool from tipping over. That is the 363 sale of debtor's assets tethered, tethered to the assets of its non-debtor parents. And I say novel because I go back to Mr. Jonas in his first appearance here where he elicited from one of the witnesses that he'd never seen this before, a man, I think it was the investment banker.

We have seen 9019s of this nature discussed or utilized in mass torts before, but never, ever like this and never in such a deliberate or accelerated time frame. There's the Kidde case, KFI case in Delaware, where there was no prepack. What happened was there was a special committee and

49

there were mediators and there was committee involvement and there was a $540 million settlement plus insurance. And that's presently in front of Judge Silverstein going for confirmation this year.

The WCD case, which Your Honor has seen the cites to, which is in New Jersey in front of Judge Kaplan, has made appearances in front of the Third Circuit. There was no prepack. There was a mediation between the committee and the parent. The parent, I think, is offering $500 million there too, and it hasn't worked out so far.

And there was the Exactech case in front of Judge Silverstein as well. No prepack, but a special committee, mediation, unsuccessful, and those claims, successor claims, went to a litigation trust for the benefit of claimants. And that litigation trust now has a billion dollar claim pending in Delaware Chancery Court. And of course there's a motion to dismiss, but we'll see what happens there.

In other words, this is and remains an extraordinary case, the clear purpose of which was and remains to obtain expansive non-debtor releases for the parents and their affiliates on their substantial tort liability. And that informs my remarks here and it always has informed the Committee's actions and positions in this case in which the Committee goes forward in good faith.

Also, this contract marks a significant step on a

50

path to eviscerate the requirements of Bankruptcy Code 524(g), which authorizes third-party non-debtors a discharge of a liability, but only with the overwhelming consent of the claimants they've harmed.  Notably, the claims released in this case are the very sort of claims that can come within the definition of 524(g).

This Court acknowledged in its decision there's no amount of money that can ever compensate the talc claimants for their injuries and loss of life, much less make the claimants whole.  Why this statement is arguably true and we appreciate it, it does not mean that this debtor should be permitted to settle the non-debtor claims of these creditors, stripping them of their constitutional rights in the process while providing expansive releases to its affiliates with little if no contribution for those releases.

This, as I will address shortly, is especially true, whereas here, these creditors shouldering the overwhelming majority of losses have uniformly rejected this settlement.  As Your Honor has seen from our motion for stay pending appeal, we respectfully appeal, respectfully, from the settlement order because we submit there's error in it, both in law and in fact, and I'll cite the three things.

First, we believe there's no legal basis in the Bankruptcy Code or the law for a debtor to claim ownership over tort victims' personal property or wrongful death claims, no

51

matter whether they are alter ego or successor liability claims.

Second, there's no legal basis for applying the standard Rule 1019 factors as the Special Committee did when they actually evaluated the deal. They admittedly evaluated under business judgment. Where the circumstances here demand rigorous -- rigorous is a word used by Judge Ambro in WCD 1, rigorous for these sort of things, heightened scrutiny with special deference to the views of creditors whose claims the debtors now seek to settle without their consent.

And third, Judge, we believe, there's no evidentiary basis for finding that the Special Committee, under this rigorous standard of review, fully or even adequately investigated a value of the claims released. While it is correct that the Committee professionals, as Your Honor noted, worked tirelessly to investigate the settlement as fully as possible, the fact that it had to do so without essential information that was purposely withheld until the last minute under the guise of attorney-client privilege, and in the face of clear case law recognized by Your Honor in granting our motion to compel, shows an intent by the independent manager, supposedly a fiduciary, from my constituency, to stymie the Committee's investigation, our Committee's investigation, as to whether there was a full, fair, and meaningful investigation of all claims in the settlement to release.

This conduct counts for something and should count for something in the evaluation. The circumstances, cadence, and impact of this case are indisputably extraordinary to warrant a stay of the settlement order pending the Committee's appeal from the settlement order, which appeal is our right.

Legal standard. The Committee's stay request has been presented to this Court in accordance with Bankruptcy Code 8007, as Your Honor knows. I'm going to skip a little bit, because Your Honor knows the Nken case. First, whether the Committee is likely to succeed on the merits. Second, whether the Committee will be irreparably injured by a stay. Third, whether the issuance of a stay will substantively injure other parties interested in the proceeding. And fourth, where the public interest lies.

These factors are substantially similar to the factors that our Second Circuit requires to be examined to determine whether a preliminary injunction should issue. It is important to note that the decision whether to issue a stay ultimately requires a balancing of equities that weighs the relative harms to the movant and respondent, as well as the interests of the public at large.

Moreover, Judge, the Second Circuit standard for injunctions, which informs the stay pending appeal criteria, is well known to Your Honor, and that is either likelihood of success on the merits or sufficiently serious questions going

53

to the merits to make them a fair ground for litigation.  And the balance of hardship decidedly tips in the movant's favor and then irreparable injury.

Before, though, I get to this criteria, I must address the overlying issue of mootness, which I read in all their papers.  And note for the record the Committee's markers as to this issue in connection with the appeal from the settlement order.  Clearly, the mooting of its appeal of the settlement order would without question cause the Committee and its constituency irreparable harm by eliminating the ability to return valuable claims, depending on what the law is at the time, either to the estate or to the claimants that are otherwise going to be extinguished.

I want to make crystal clear the Committee does not concede that by making the stay pending appeal motion or otherwise the debtor can or the parent can moot the appeal of the settlement order under 363(m) or the doctrine of equitable mootness.  And we request that our position be noted clearly on the record.

Our marker number one, Section 363(m) does not apply to the appeal.  The appeal of the settlement order cannot be rendered moot under 363(m) for at least three reasons.  First, 363(m) applies only to a sale or lease of property pursuant to Section 363(b) or 363(c).  The debtor does not purport to sell or lease any property in the settlement motion or settlement

54

agreement. And state law generally prohibits the assignment of personal injury and wrongful death claims to the extent that the settlement of the tort victim's personal injury claims is characterized as a sale. The sale itself must be treated as void for public policy under applicable law. We've cited those cases, so I don't need to do that.

Also, there is no good faith purchaser, we believe, under the settlement agreement rendering 363(m) inapplicable. It's recognized in the Gucci case, Second Circuit. I think you have that, 126 F.3d 380, 389. A good faith purchaser is one who purchases the assets for value in good faith and without notice of adverse claims.

And Cooper from the Southern District of New York Bankruptcy, 592 B.R. 469, 477. Purchasers that have knowledge of the facts giving rise to adverse claims do not qualify as good faith purchasers. The parties to the settlement agreement are well aware of the adverse ownership claim that the Committee has asserted over the released cause of action, the cloud on title.

Third, the Committee has put Vanderbilt Holdings' good faith at issue by arguing that the settlement agreement was not entered in good faith. Again, I'll refer to Gucci and Abbotts Dairies of Pennsylvania, 788 F.2d 143 (3d Cir.).

Further, marker two, the doctrine of equitable mootness does not apply. The appeal of the settlement order

55

cannot be mooted under the doctrine of equitable mootness, which requires, among other things, that the subject plan or agreement be substantially consummated.  First, the settlement agreement explicitly provides it cannot be consummated until there was a final non-appealable order approving it.  We understand what's happened to that, but what's happened to that is their conduct with their knowing full well the risks they face from an appeal.

And the doctrine of equitable mootness does not offer a safe harbor to parties engaged in inequitable conduct.  And I'll refer you to the Fifth Circuit's seminal case in <u>Highland Capital</u>, 48 F.4th 419, equitable mootness does not bar appellate review of the legality of a non-consensual non-debtor release.

As the Committee is seeking a stay, there can be no comprehensive change in circumstances to occur here that would make it inequitable for an appellate court to reach the merits of appeal.  If the parties to the settlement waive the requirement as they did a final non-appealable, they do so knowingly, fully cognizant of their own risk and what they are doing.

Now to the merits.  The standard for stay pending appeal, we believe and submit respectfully, has been met.  And now I turn to the elephant in the room that has been here since day one of the case.  What we call the appropriation of

56

successor alter ego claims of tort victims against debtor's parents and affiliates as claims of the estate once the bankruptcy was filed, and then the settling of those claims without any plaintiff involvement before the bankruptcy was filed.

The debtor introduced the three-legged stool concept during its first day, Your Honor, as we've spoken. We, too, on my side of the aisle, have something akin to the three-legged stool as well. These are bankruptcy law matters affecting tort claimants and creditors at large that went up or are likely to go up to the Supreme Court of the United States for review and decision.

The first, of course, was the Purdue release, which has been decided. And I submit the remaining two, both of which Justice Gorsuch's majority opinion alluded to in Harrington, and which was discussed on the bench during the argument of Purdue, are what constitutes consent for a release, the opt-in versus opt-out, and we're familiar with that all across New York in diocese cases and commercial cases. I know Judge Cote in Southern District has written a decision on it. I think it's up in the Circuit now. Maybe I'm wrong, but I think that issue's up there.

And then, what constitutes an estate release, the very issue that's now before your Court. I'm not here today, Judge, to attack the precedential weight for Your Honor of

Nordlicht or Kwok or its progeny.  We have done so in our papers.  But I'm here to note at minimum that the matter at hand here presents, and nationwide, here and nationwide, serious questions going to the merits to make them a fair ground for litigation, if not plausibly likely to succeed on appeal under the present legal landscape.

To do this, however, I will need to start with Purdue and Mr. Harrington, who's Ms. Champion's boss, and a few other creditors' objection to the Purdue plan, which was consented to by over 98 percent of Purdue's creditors, which brought over $5 billion of Sackler money to those creditors for opioid abatement by the governments or individual injury by personal injury claimants.

Three, which was confirmed in a carefully written, brilliant 100-page-plus confirmation opinion from Robert Drain. And, four, which opinion by Judge Drain was supported, as the claim is here, by decades-old Second Circuit precedent, Metromedia, and most other circuit courts in the nation. Trustee Harrington put his hand in the air and said, wait, there's nothing in the Bankruptcy Code, my little mini book, nothing in this Code, granting these releases or supporting them or authorizing them.

I know some folks in the academia and in Court pointed to 105 and 1123(b)(6), but when you read those, those are pretty vacuous and don't talk about this issue.  And

58

Trustee Harrington appealed and asked for a stay pending appeal. A stay pending appeal to avoid the mooting of his appeal by the substantial consummation of a very complicated, very heavy moneyed plan that would benefit opioid victims nationwide. And he asked for the stay pending appeal under the equitable mootness doctrine.

The initial appeal went to Judge, and I think she was possibly chief judge there, Colleen McMahon of the Southern District of New York, who issued the following order, which I submit is relevant here.

And can I pass it up?

THE COURT: You may.

MR. MOLTON: I'm going to read just two paragraphs from it, three paragraphs.

The United States Trustee has anticipated by two days one of the items on my agenda for our conference on Tuesday, that being the question of a stay pending appeal. She then writes, "This Court is all too familiar with the doctrine of equitable mootness as applied in the Second Circuit, as it has upended my ability to decide at least one previous bankruptcy appeal. I'm also aware of the fact that the issue is presently under consideration at the United States Supreme Court, the equitable mootness doctrine, which will resolve it one way or another this term."

I don't think she was right on that, by the way.

59

She then writes, "Finally, I have no intention of allowing the critically important issues on appeal to be equitably mooted. And I had intended to ask the parties about their views on a stay when we got together. Now I have a formal motion." I think that was the Harrington motion.

"I intend to resolve the question on Tuesday with oral argument. As long as I have jurisdiction to enter a stay pending appeal, I fully intend to do so, unless some opponent comes up with an argument that I cannot presently anticipate. Although I will listen to what anyone has to say. The stay will be conditioned on adherence to the expedited briefing schedule for the appeal."

I mean, those of you who know Judge McMahon, this is pure Judge McMahon.

The rest of the story we know. Judge McMahon vacated the confirmation order, notwithstanding Metromedia, and on appeal the Second Circuit reinstated Judge Drain's confirmation order, relying on its precedent. SCOTUS granted cert and reversed 5-4, the majority agreeing with Trustee Harrington that the Bankruptcy Code did not anywhere authorize a Purdue release. The stay remained in place until that decision, but just last Friday we closed a very complicated, but SCOTUS-kosher Purdue plan that actually had the Sacklers contributing more money than the first time.

That brings me to the issue at hand. Here, the

60

argument raised is also that there is nothing, nothing in the Bankruptcy Code that provides for the appropriation of successor liability or alter ego claims as estate property into the estate. Our Second Circuit in the cases that you've cited, Your Honor, has seemingly found that authority in Section 544. There's been much written about this point, with some legal commentators pointing out that nothing in Section 544, nothing really captures the successor or alter ego claims of tort claimants.

In Whittaker, Clark & Daniels, where the released parent, as I mentioned, was offering debtor approximately $500 million for an estate claim release, very different than the situation here, Bankruptcy Judge Kaplan also so held. The matter went up to the Third Circuit, which issued a first opinion written by Circuit Judge Ambro, a former Bankruptcy Judge. On rehearing, with further briefing on this very issue and an amicus brief taking the tort claimants side and position by 15 States' Attorney Generals, including New York's Letitia James, Judge Ambro affirmed the ultimate holding of his first opinion that product line successor-type claims of tort victims become estate claims property on the filing of a petition, but in doing so he kind of left along the track and discarded the 544 approach articulated by our circuit. He viewed the Supreme Court opinion in Caplin as problematic to the 544 approach.

Instead, Judge Ambro spent 22 pages of his opinion

61

blocking and tackling Supreme Court precedent to sustain a theory, as best I can articulate in simple terms, that federal common law is the foundation for these claims being deemed estate property upon a petition being filed and thereby can be settled by the debtor without, arguably, a creditor vote or consent.

The circuits are now split on this issue, with the Second and Third taking a view of estate property, but I do want to note the Sixth, Seventh, Eighth, and Ninth Circuits seem to take the view that estate property is whether or not the company has under applicable state law that claim prior to bankruptcy. And that's Ninth Circuit, Ahcom, 623 F.3d 1248; In re RCS Energy Products, that's Sixth Circuit, 102 F.3d 223; Steinberg, Seventh Circuit, 40 F.3d 890; and Ozark, 816 F.2d 1222, that's Eighth Circuit, and these apply state law to see whether the company has the claims.

The circuits are now split and it's not speculation to surmise that it's likely that the appellants now in Whittaker, Clark & Daniels will be dropping a cert petition in the Supreme Court's cert bucket in the near future, as we here work our way up the appellate ladder.

To sum up, Judge, on this first issue, which we have raised since day one, the estate claim issue, the issues presented by the committee, at a minimum, raise sufficiently serious questions going to the merits to make them a fair

62

ground for litigation. Indeed, we see this litigation going on all over the country. And we believe we're likely to succeed on the ultimate appeal by the ultimate court, and we believe that that may be happening -- well, I can't predict that, so I'm not going to.

The committee stands before Your Honor right now much in the same -- much as stood Trustee Harrington before Judge McMahon, facing claimed -- and we get it from their papers all the time, established circuit precedent that allegedly puts a stake through our heart, but the committee, our committee is not convinced of that precedent's legal underpinnings. Unlike Purdue, however, where Trustee Harrington pretty well stood alone, we are not standing alone. We are supported by the creditors' claimants, who overwhelmingly reject the settlement at issue and will get almost nothing from it.

Further, clearly the committee and its constituents will be irreparably injured if a stay is not granted to forestall the potential of a statutory or equitable mootness, at which I anticipate we will see efforts as it begins to litigate this issue up the appellate staircase. Any such mootness, in our view, will irreparably prevent the recovery of state law claims that were appropriated, wrongly, from the claimants or, if they are estate property and that's the holding, were settled without meaningful investigation or diligence.

63

Lastly, Your Honor, debtor's cry of hardship and prejudice rings hollow. It never solicited claimant input, never involved them in the negotiations of the settlement, and instead it deliberately built and pushed forward on a hurried basis this mousetrap, its three-legged stool, and it is a structure, it is the structure of their own mousetrap, Your Honor, not the committee exercising its legitimate right to appeal and protect what it's appealing that is causing any claimed hardship to them. Having released these claims over the claimant body's almost unanimous -- I'd say unanimous objection, they would now seek to deprive us of an appeal of that release.

The law is crystal clear that where a party's own conduct -- and this is what we talked about before -- results in hardship to itself, the balance of hardships tips in favor of the movant, and I'm going to cite some cases, if I can, Judge. I'm going to cite a Second Circuit case, <u>Hirschfeld v. Board of Education</u>, 984 F.2d 3539, where irreparability of harm was the product of the movant's own course of action, it severely undermined the argument for irreparable injury.

<u>First African Trust Bank</u>, 1992 WL 276833 at *5 (S.D.N.Y. 1992). To grant plaintiffs' motion based on a harm caused in part by its own actions would unduly reward plaintiffs and eviscerate the requirement of irreparable harm.

And --

64

THE COURT: Mr. Molton, could I get you to repeat that First African cite, please?

MR. MOLTON: First African -- I'm sorry, Judge, I'll go slower -- 1992 WL 276833 at *5.

THE COURT: Thank you.

MR. MOLTON: Caplan -- but not the Supreme Court's Caplin, I don't think -- v. Fellheimer, 68 F.3d 828, Third Circuit. If the harm complained of is self-inflicted, it does not qualify as irreparable.

And lastly, Judge -- and I'm making a little bit of a mess here, but I'll clean it up -- Phillips 66 Company, Eastern District of Pennsylvania -- I don't have a Westlaw cite, but I can -- it's on -- oh, here it is, 2024 WL 4466681, and that's Phillips 66 has shown that the balance of hardship supports its claim -- it was the plaintiff -- for injunctive relief because 1842 Ridge's hardship, the defendant, is caused by its own conduct.

I now turn to our position requiring the likelihood of success criterium in our appeal of Your Honor's application of heightened scrutiny in connection with the Iridium factors.

Your Honor is well aware of the seven factors, I'm not going to waste time on that. We submit, respectfully, Judge, that the Court should not have and could not have under the heightened scrutiny standard -- what Judge Ambro has said, rigorous scrutiny in connection with these estate claims that

65

were before the bankruptcy claims of somebody else -- have approved this settlement after consideration of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated, as required under relevant decisions like O'Connell v. Packles, 404 B.R. 58, Eastern District New York.

Even after acknowledging that the insider parties involved in the settlement agreement required the application of heightened scrutiny, we read the decision, respectfully, Judge, as just a straightforward analysis of the Iridium factors without the import of an impact of heightened scrutiny and specifically rigorous heightened scrutiny that's required in this case. The decision relied heavily upon Mr. Pickering's testimony that he fully considered all potential claims that could be brought by the debtor and, in so doing, we submit the decision ignored the testimony elicited by the committee which established that Mr. Pickering's investigation, which was concededly conducted and concluded by him under the inapplicable business judgment standard, and basically gave credence to his business judgment standard application of diligence.

And the hearing testimony from April 16th from counsel, Mr. Pickering will testify why. It is his business judgment that settling those claims maximized the value of the estate.

66

Item two on Iridium, protracted litigation.  We believe there's no proper basis to determine that not approving a prepetition settlement in which the largest creditors had absolutely no voice, the only settlement before the Court in light of the rushed nature of this case from the petition date would lead to a protracted, wasteful litigation.

Again, the usual course is that these issues are addressed in the bankruptcy.  As I noted and I gave Your Honor some example, the Court brings in mediators, people get into rooms, and the committee and its constituents negotiate with the parent and its counsel and principals in terms of what a fair value is.  That didn't happen here, but that happens all over.

The decision relying on Mr. Pickering's testimony to the exclusion of evidence -- the decision relied on Mr. Pickering's testimony to the exclusion of evidence by the committee questioning Mr. Pickering, we submit.  It's uncontested that no value was exchanged for the settlement of these claims, meaning the monies that my friend Mr. Vomero is so proud to have gotten, $64 million, by the way of being able to sell the combined assets.  Those combined assets, the consideration given to the debtor was for other things, as Your Honor heard, not for the alter ego claims, which were valued at zero, but nonetheless a release was given.

Also, it's uncontested -- I mentioned that usually,

67

Judge, this protracted litigation criterium applies where the settlement amount between fairly negotiating parties is sometimes far less than the value of the claim itself. Here, nobody, nobody who had the real interest in these claims, whether it be as creditors of the estate or as owners of the claims, was in the room. The record shows that the Special Committee -- and this goes to my point -- made no demand on these claims, despite evidence uncovered in an investigation supporting such claims, including statements from the president of Vanderbilt Holdings that Holdings pulls all the strings and the debtors were simply providing a rubber stamp at Holding's behest.

Further, my friend from Vinson's remarks at the end of the settlement approval trial clearly show that despite his protestation as to the frivolous nature of the claims, a statement, by the way, plaintiff attorneys hear all the time, often right before they land a valuable settlement or gain a valuable verdict, the release of those claims were of value to the debtor parent and its non-debtor affiliates and they would not have done the deal without them. Again, I would ask you to read the closing remarks from the sale hearing.

And we heard today from Mr. Vomero there was never any ask. That thing was put on the table at the very get-go, there was never any ask for it to be withdrawn, notwithstanding that if the -- if the assets could have been bundled together

68

and valued and sold together without those claims, none of these parade of horribles would be happening, we would be in a room with the parent and the sale would go forward.

Again, the special manager made no demand whatsoever for the tender of these broad releases, which were sought from day one by Holdings and its affiliates. So to say there's no value when the other guy is saying it's got to be in there -- in any event, paramount interest of the creditors and their support for the settlement.

Judge, I respectfully suggest that this is our biggest -- one of our biggest points that I want to make.

THE COURT: Mr. Molton, may I just interrupt you for one minute? We just need -- well, we just need to have a switching of the --

MR. MOLTON: It's okay. I'm almost done --

THE COURT: Oh, okay, it's just --

MR. MOLTON: -- but I don't want to run over, if Your Honor wants to switch --

THE COURT: I don't want to rush you, is the only --

MR. MOLTON: I've got just a few pages left.

THE COURT: Okay, but you wont' be done in five minutes. I don't want to --

MR. MOLTON: It may be seven, it may be five or seven.

THE COURT: Okay, that's fine. Please proceed.

69

MR. MOLTON:  Okay.  This factor, Your Honor, clearly weighs against approving of the settlement.  As the Court acknowledged, this is a -- this clearly is an important, indeed, we submit, the fulcrum criterium.  And from our perspective, Judge, the present state of the law and the particular circumstances that these are not pure derivative claims, these are a little different, as all the courts that we've talked about, you know, have mentioned and have struggled with -- this isn't a breach of fiduciary duty claim, these aren't claims that are owned by the debtor before the bankruptcy -- we submit that this should be the fulcrum point and that, without the overriding consent of the creditor body, the -- under Iridium, paramount should become fulcrum for these particular circumstances.

And there's case law to support that and, instead of reading it, I'm going to cite to you on it.  Footnote 13 on page 15 of our brief, heightened -- and we cite a Fifth Circuit case, I don't have to spend time reading them -- holding a heightened scrutiny standard was not satisfied when the settlement is between insiders and an overwhelming majority of creditors and interests oppose such settlement of the claims.

Judge Silverstein in Kidde-Fenwal struggled with this issue too and if you read her decision, which is on Westlaw, 2025 WL 1693173, she said Emoral -- in the Third Circuit, Emoral claims should not be approved -- that's our Kwok claims

70

-- absent, among other things, overwhelming support of the affected creditors and showing that a settlement would result in the payment of all or substantially all of the affected claims.  And I cite other cases thereto for that position.

We submit, Judge, that under these particular circumstances -- and then again looking at Judge Ambro's rigorous -- not just heightened scrutiny, rigorous scrutiny for these claims, the courts are making distinctions between estate claim releases of traditional estate claims and estate claim releases between insiders where the plaintiffs aren't involved like here of claims that had been somebody else's property before the bankruptcy.

Position of other parties in interest.  The Court weighed the interests of the 125 employees, as it should, whose jobs by the way, as we found out today, have not been guaranteed by a future purchaser and the settlement agreement actually allows them to fire them, but those 125, I would respectfully submit, under rigorous scrutiny and going towards the consent of the claimants, there's ten times that number of asbestos claimants out there who are being harmed by this settlement.  And support of a DIP lender or employees that do not hold claims against the non-debtor insiders and the affiliates based on alter ego, support of interested other parties for those claims shouldn't be used to negate the overwhelming rejection of this deal by the plaintiffs.

71

Competency of counsel, we believe -- I know Your Honor dealt with this, but in the extraordinary context of the facts here we don't believe it was properly considered. We, with all respect, did not consider the unsecured creditors nor its committee had no voice in the preordained prepetition settlement, and those folks are pretty good negotiators, the representatives of the claimants.

Also, the Court didn't analyze, let alone mention, a shadow that is everywhere -- was everywhere, and that's Jones Day's influence over this case. The fact that Jones Day's retention was not granted for the reasons cited in the Court's retention disapproval opinion does not erase its extensive involvement, and we believe conflicted involvement, on both sides of the aisle, both sides of the arrangement until very late in the game, including its role in eliminating the $120 million receivable that we heard the say-so for, but it was never really tested, due to debtor from Holdings. And that was the very reason, I believe, one of the principal reasons why the Court was bothered with approving that retention. The presence of Jones Day as principal restructuring counsel to Holdings and its affiliates for two years -- for years, rather, until September '25, less than two months before Holdings was insisting on estate releases, cannot be ignored.

The purpose of this factor is to ensure -- this is what the case law says -- that all voices are equally heard in

72

negotiating the settlement. Here, the affected parties were not involved, nor were their interests considered. Nobody talked to a plaintiff. Mr. Pickering could have easily picked up the phone to any one of the plaintiff lawyers and said explain to me these claims, explain to me how you run these claims, explain to me how you value these claims. Not once.

The nature and breadth of the releases. In your memorandum opinion, Your Honor acknowledged that releasing known and unknown causes of action against Holdings and the affiliates under such a tight time schedule, I think you used the word problematic, but the consideration of that issue ended there. In the end, you know, this settlement was approved with those very same and unnecessary -- we believe unnecessary releases, notwithstanding the problematic squeeze that was put on all of us.

Arm's length bargaining. As the committee noted -- that's another Iridium factor -- in the motion before the Court, the fact that the negotiation of the settlement took place before this case was commenced, outside of the Court's light, behind closed doors, belies a conclusion that arm's length negotiation ensured the settlement was fair and equitable to all parties. We didn't have -- nobody had a seat at the table from the claimants' side, the people who would be most affected, and I said nobody talked to them, nobody even talked to them.

73

Simply put, we believe the Iridium factors, under the particular circumstances of this case, were not properly applied or analyzed with the necessary rigorous scrutiny. Moreover, the basis provided for satisfying each of the seven factors that our friends on the right -- on this side of the aisle were thin.  And creditor support -- and I'm going to say it again, looking back to the cases I cited to you on page 15, paragraph -- note 13 -- plaintiff support should and must be the crucial deciding factor in this analysis.

The committee has also -- for these reasons, Judge, I submit that the committee satisfies -- putting the big-ticket bankruptcy issue on the side -- that the committee satisfies the prong requiring success on appeal with respect to the Iridium factors in connection with this.

The committee has also clearly established the irreparable injury prong.  I've already gone through that before, I'm not going to waste time, I know we're running out of tape.  The Court's approval allows their claims -- their property, arguably, in many circuits and maybe we'll get a decision from SCOTUS on that -- to be eviscerated and taken over their objection without due process, a filing of a bankruptcy petition without notice to them for little or no consideration and, again, without their consent.

The issuance of a stay will not injure any other party.  Vanderbilt itself bargained for the right to withhold

74

the settlement assets to Holdings until the appellate process ran its course, meaning they protected themselves. Well, they decided now to give up that protection. So, again, it's hard to credit them harm. And Mr. Pickering has agreed, apparently -- and, again, I haven't read it at great length, so I don't want to misstate, but Mr. Pickering has agreed to waive his fiduciary out once the sale is closed.

Finally, Judge, we submit that the public interest strongly supports the issuance of a stay here. This is an extraordinary case, for the reasons that I went through, and that's why I went through them at the beginning of my remarks and I think my few pages on where the cases are going and the conflicts between the circuits points to that effect. And, as I mentioned, this is -- unlike those cases, this is a prepack, fast-track, 9019, jam-it-down-your-throat settlement and, accordingly, we believe the public interest supports that the committee's rights -- again, with the caveat that we don't think that mootness can ever apply here, but you never know and that's why we're asking for a stay -- but the committee's rights are preserved for ultimate review on these issues by an appellate court.

Your Honor said the Second Circuit does not apply a rigid rule that the failure of a movant to satisfy only one of the four prongs is fatal to stay relief; instead, the circuit has consistently treated the inquiry of whether to grant a stay

75

pending appeal as a balancing of factors that must be weighed. The balance of factors before the Court today and as I have tried to summarize clearly tips in favor of a stay of the settlement order pending the committee's appeal from the settlement motion.

Now, I know that somebody, I think it was the Special -- somebody asked for a bond and said we should be asking for bond -- Judge, Your Honor knows that there's no bond forthcoming from the committee unless these guys give up the money to post the bond.  It's just -- in this situation, it's a -- it's almost a laughable request.  But we did some research over the past 24 and I don't think we found one case regarding a committee being forced to post a bond, but it's your discretion, Judge, and we understand that.

The fourth leg of the stool, Judge, which is inherently built into the papers that I read coming up here yesterday, their fourth leg is mootness.  They want -- they're going to try -- and I may be proved wrong, but I've got to stand here and represent my client and predict what usually is predictable -- they're going to try to prevent these issues, which are worthy of appeal and worthy of percolation and worthy of high appellate attention, they're going to want to stop that.  They took away -- from my client's perspective, our constituent's perspective, they took away our claims and now they want to take away our appeal, at least that's what we see

76

happening.

That concludes my remarks, Judge. If you have any questions, I'm here to answer them. I tried to address everything that I saw in this case that we wanted to put an answer to on a simple, easy, understandable basis to understand why it is that we think we're doing what we're doing in our fiduciary capacity and in accordance with our fiduciary duties, and why we think a stay under this case under these circumstances is appropriate and proper.

I haven't lost my voice yet, so if Your Honor has questions, I can answer.

THE COURT: I do not. Thank you, Mr. Molton.

MR. MOLTON: Okay, thank you.

Let me clean up here for a second, guys.

THE COURT: Sure. We are going to just take a brief -- it's 3:40, we're just going to take a five-minute break. We just need to have our ECROs swapped out here so we can continue.

So we'll just take a very brief break to 3:45, just five minutes. Thank you.

THE CLERK: All rise. Court will take a brief recess.

(Recess at 3:40 p.m./Reconvened at 3:45 p.m.)

THE CLERK: All rise. You may be seated.

THE COURT: Resuming with argument.

77

MR. SMITH: Good afternoon, Your Honor, Robert Smith for Ben Pickering, the independent manager.

If I could beg your indulgence on a housekeeping matter. I moved for full admission in the Northern District of New York on Monday, that application is still pending. I am a member of the bar of the State of New York, the Eastern and Southern Districts and the Second Circuit, and I am in a good standing in all jurisdictions, so I hoped that I could present argument here today.

THE COURT: You may --

MR. SMITH: Thank you, Your Honor.

THE COURT: -- permission granted.

MR. SMITH: Your Honor, the Court should deny the UCC's stay motion. Under Nken, the UCC must satisfy four factors to justify the issuance of a stay. And the Supreme Court has described that as a heavy burden for a reason, it disrupts the normal order of events, which is that there is finality when trial courts make decisions, and what I heard today did not come close to satisfying that standard.

Essentially, I heard a motion for reconsideration on the Iridium factors and I heard a concession that their main argument is foreclosed by binding Supreme Court precedent, I believe they said it drove a stake through their hearts and that they may petition for cert one day. That's not enough to demonstrate the relevance standard.

78

So, I'll start with the merits, and there's some confusion on what the standard is there. The Supreme Court has made clear that the showing is a strong showing of likelihood of success on the merits. I understand they invoked the serious questions doctrine, that is a Second Circuit doctrine that exists for preliminary injunctions. The Second Circuit has clarified post-Nken that that standard remains good for preliminary injunctions. I am unaware of any decision from the Second Circuit that says that the Nken standard is not binding on the courts within the Second Circuit as it applies to stay applications. So, I think the standard that's applicable here is a strong showing of success, and I didn't hear that under either of the standards, as I've mentioned.

Starting with the argument about a Purdue end-around, I think Your Honor addressed this head-on in your decision approving the settlement, which is that a long line of Second Circuit precedent -- Kwok, Nordlicht, and St. Paul -- address this issue and hold that successor liability, alter ego, veil-piercing claims are general claims, they -- under Section 544, they are claims of the estate, and those claims can be settled by the estate.

Counsel for the first time -- when he first mentioned these cases said that they had addressed them in their papers, they didn't need to retread any ground. I looked over the papers in preparing for this, I've never seen a mention of Kwok

79

in any of their papers.  The first time they've acknowledged it is here today and, again, I heard a concession that it's foreclosed by binding circuit precedent.  I don't think that the standard of a strong showing of success can be demonstrated where a party simply says that maybe we'll get cert from the Supreme Court.

I am not in a position to evaluate the circuit split that they have cited because they did not cite it in their papers for us to consider; instead, their papers have treated these as personal claims that are being settled against non-debtors.  As Your Honor knows, that's just not true.  No direct claims are being released under the settlement that's been approved.  So, neither aspect of their attack on this Court's judgment on their primary appellate argument has any validity, and the likelihood -- I know I've addressed cert, but the likelihood that the Second Circuit sits *en banc*, generally it's about once every other year, in my experience, the Second Circuit sits *en banc* to reconsider a case.  In this situation, where you have three or four decisions that have all gone the same way without any noted dissent on the issue, I think it's just extremely unlikely and that is not a strong showing of success.

On the Iridium factors, what I heard again was, respectfully, a motion for reconsideration of your Court's decision.  So, let's talk about what the standard is here

80

because it's a compound standard.  They have to show a strong showing of success that you abused your discretion and, to find an abuse of discretion, they have to identify either a clear error of law, which they have not done here; they have to show that your factual findings were clearly erroneous, which is impossible if there are two competing versions of a story that Your Honor decides to credit; or they have to demonstrate that your decision falls outside a range of reasonable decisions and, as we have cited and the Second Circuit has said repeatedly, it is not an abuse of discretion just to convince a reviewing court that they might have made a different decision from yours.

And so they have not shown that you abused your discretion in applying the Iridium factors.  In going through those, you carefully analyzed the relevant factors, and it was by no means a rubber stamp of my client's determination that this was in the best interest of the estate.  You methodically went through them, listed factors where you thought cut the other way, but at the end of the day balanced all of the factors and came to a determination that this settlement was appropriate under the circumstances, and I don't see any basis for attacking that.

On the margins, I also think -- I quibble with what the UCC has represented to you in their papers slightly, and maybe it's just, you know, people can be forgiven for using

81

loose words, but saying that you didn't mention Jones Day's rule in this is just -- role in the case is fundamentally false. You mention it in discussing the Iridium factors, but discount it after deeming my client credible that he had sole authority to investigate and to resolve these claims, and that he did so engaging in an arm's length negotiation with Holdings and other affiliates and making a determination that it was in the best interests of the estate to go forward.

So, on the likelihood of success factor, I think it's easy, they have not demonstrated that. And to be clear, the Supreme Court has said that the first two factors are a prerequisite. So it's not just a balancing of four factors, they have to demonstrate the first two in order to pass to a balancing test on the remaining factors, and the Second Circuit has made clear that if they don't show a showing of likelihood of success you don't even have to consider the remaining factors. And we cited that, that's Uniformed Fire Officers Association v. DeBlasio.

So, I think Your Honor could reject the stay request at the outset that there's been a complete lack of showing of a likelihood of success on the merits, and it would be consistent -- I guess to summarize this aspect of my presentation this way: I don't understand how you've shown a likelihood of success on appeal when your papers don't engage in the primary decision-making and standard of review that an appellate court

82

is going to apply to that decision.

So the papers don't address Kwok, they don't address Nordlicht, they don't address St. Paul, and then their papers don't address the abuse of discretion standard that a reviewing court is going to apply.  So, a lack of likelihood of success on the merits.

As far as irreparable harm is concerned, I would point Your Honor to the decision of Nken itself, which emphasizes that simply showing some possibility of irreparable injury fails to satisfy this factor, and that's at 556 U.S. 434 through 35, it carries over.  And that's consistent with what Bankruptcy Courts have held in judging this factor.  The idea that there's a possibility of equitable mootness, the majority of courts in the Second Circuit have held, is not sufficient to show irreparable harm, and that makes sense.  Whether an appeal will become moot is for the District Court to decide and it's for the District Court to decide at the time that the District Court hears the case.  So, the idea that you could issue an advisory opinion saying that this case will not become equitably moot, I don't think you could square that with the functions of a traditional court.  Whether the appeal will be moot will depend on how expedited the District Court hears the decision, whether or not a plan has been confirmed, the terms of the plan that you approve, and a variety of other factors that will go into that decision-making process.

But even if the Supreme Court hadn't said that a mere possibility of irreparable injury didn't foreclose this factor and you could count a risk of mootness, the GM decision that we cite in our case -- in our papers demonstrates that it just gets on the scoreboard, so to speak.  It has to be balanced against other factors, and those other factors would include the substantial injury that will result to the debtor and to other interested parties, and it also has to take into account the merits of the appeal and the fact that there is a lack of showing of a likelihood of success on the merits here.

And the Adelphi decision says that as well that where there's a possibility of equitable mootness a court will perhaps exercise its discretion if there are significant claims of legal error here, and I would submit that you cannot demonstrate significant claims of legal error if you have not demonstrated a likelihood of success on the merits.

So, as for the third factor, which is the potential for harm, debtor's counsel will address that more directly than I will, I just want to touch upon the high points for Your Honor.

The first thing I want to emphasize is, it's a different standard.  Whereas they have to demonstrate irreparable injury, the debtor and other interested parties simply have to show that they would suffer substantial harm if a stay is granted.  And I should say that in fact they have to

84

show that we will not suffer harm, because they bear the burden on all four factors, and they haven't purported to demonstrate that here.  What I heard today was that the debtors caused the harm.

I want to be clear what harm we're talking about here.  The harm was caused by crushing tort judgments.  The debtors needed to rush through a bankruptcy proceeding because they are running out of money and the ability to continue to operate as a going concern.  I don't think you can describe that as them causing the harm.  They are reacting to an environment in which they can no longer continue to go forward as a going concern unless they obtain relief.

And as far as the harm if a stay is issued, the harm is I think obvious to the debtor; it will not be able to continue to move forward as a going concern, you heard that in testimony here today, it risks job loss, vendor relationships, customer relationships, and it's to the detriment of the entire estate's creditors if this is forced into a liquidation in which you're just selling off component parts, as opposed to continuing an ongoing concern for the debtors.

Finally, with respect to the public interest, I think the public interest weighs heavily in favor of a stay for a variety of reasons.  It's in the public interest that debtors that are reorganizing emerge from bankruptcy and generally that they emerge quickly from bankruptcy because of all the

85

testimony you heard today about the spend rate that comes from reorganization and retaining professionals and everything else. In addition, settlements are favored, as you cited in your decision, they are favored because they definitively resolve litigation in an expedited fashion, and it just goes back to your decision in approving the settlement at the get-go.  I have not heard any dispute that veil piercing and alter ego claims are difficult to litigate, they are heavily disfavored under the law, there's no certainty that any of the talc claimants would prevail on those theories, and then there's no certainty that they would be able to collect in an amount that would be superior to what Your Honor approved here.

And so, for all those reasons, we'd ask that you deny the application for a stay.

I'll speak quickly to the bond.  If you were inclined to grant the stay, there is authority that you can impose a bond.  One was in a case that we cited, which was GM, that the judge -- Judge Gerber mentioned that he would require a bond in the amount of $7.4 billion to compensate for the harm that would occur if he were to stay his decision.  In addition, and it's not cited in our papers, but the Tribune case out of the Third Circuit, which deals with equitable mootness, talked about the fact that the appellant, who was unwilling to post a bond, sort of demonstrated that they didn't really believe in the merits of their own appeal because they weren't willing to

86

compensate the debtors and the other interested parties for what might go wrong if the case was not decided in their favor. And there theoretically could be funding support for a bond if the plaintiffs' attorneys' litigation funding and everything else believed that their claims ultimately had merit to the point where they were willing to compensate the debtors and other interested parties if they are wrong.

So, for all those reasons, we'd ask that you deny the stay, of course, and if you are going to issue a stay, then I think that we need to evaluate what the amount of money would be to post as a bond in order to compensate the debtors and other interested parties in the event that you were to do that.

THE COURT:  Thank you, Mr. Smith.

MR. SMITH:  Thank you.

THE COURT:  All right.  I'm not familiar with the Tribune case, are you --

MR. SMITH:  I can get you a citation for that, if you'll bear with me, Your Honor.

(Pause)

MR. SMITH:  I will have it for you in just a moment.

THE COURT:  Certainly.

MR. SMITH:  I don't want to take up precious podium time.

THE COURT:  Mr. Smith, though, I have a question.

MR. SMITH:  Sure.

THE COURT:  I wasn't sure if that was the case that you were referring to.  Were you intimating that there's case law out there that has the personal injury funding sources fund a committee's posting of a bond?

MR. SMITH:  No, I am not intimating that, Your Honor. What I am intimating is that there is case law that says that an appellant should post a bond, and in Tribune the Third Circuit said that they could consider the fact the appellant refused to post a bond as a factor in the court's analysis for essentially why a case was equitably moot because they didn't, you know, sort of preserve all remedies and they clearly didn't believe in the merits of their own appeal given that they were unwilling to post a bond.

THE COURT:  Thank you.

MS. WINE:  Good afternoon again, Your Honor, Jamie Wine of Latham & Watkins on behalf of the debtor, proposed counsel on behalf of the debtor.

We join in the arguments that you just heard from my colleague and he just covered some of the points that I was going to make, so I'm going to just add some brief remarks to emphasize a few points regarding the substantial injury to the debtor, and I want to start with the standard there again.  He noted it briefly, but I want to pause on it for a moment because there is different language used when talking about the harm to the debtor versus the harm to the moving party.  And so

when it's the harm to the moving party, the standard is irreparable injury or harm, the key word being irreparable. When we're looking at harm to the debtor or to other parties, the standard is substantial injury, and there's a meaningful difference there that I think we need to pause on that the committee doesn't grapple with in their papers or today in argument.

As Your Honor knows, irreparable harm is harm that's not remote or speculative; it's actual, it's imminent, and it's something that cannot remedied financially. Substantial injury, on the other hand, is actually a lower bar, that's how it's described in the cases, and it requires only that the harm be significant, not that it cannot be financially remedied. So we just have to have some significant harm to the debtor here.

And that's why courts -- when you look at the cases that we've cited in our briefs and I'll talk about some of them, but that's why courts have routinely found that substantial injury with a stay -- where there would be substantial injury with a stay, they look at factors such as -- I'm sorry -- this is why courts have routinely found substantial injury where a stay would lead to dire consequences that we have here. For example, loss of sale proceeds, loss of financing, additional fees and costs for the estate, lost jobs, or even, as we heard today in testimony, the risk of liquidation. These are all things that the courts have found

89

constitute substantial injury to the debtor.

And even where there's a showing of irreparable, which we would submit there is not, but where there's a showing of irreparable harm to a movant, a denial of stay can be warranted where there's substantial injury to the debtor, and that makes sense particularly in the context of a Chapter 11 case because, as you know, the objective of a Chapter 11 proceeding is to maximize the value of the debtor's estate for the benefit of all stakeholders. That's the whole purpose, that's the whole reason that we're all here. So, if a stay would jeopardize that, the substantial injury to the debtor and all stakeholders becomes paramount, that can become a driving force for why you do not issue the stay. And we've seen that in cases we have cited in our brief, for example the GM case. And I'll note that in the GM case, the movant there were tort claimants who were objecting to a 363 sale, very akin to what we have here. If you look at the Sabine case, you have the committee there were objecting to releases that were included in a plan that was being confirmed.

So, we have similar types of objections by similar types of movants and when the courts look at -- even crediting some showing of irreparable harm, when they look at substantial injury to the debtor and to the estate, it will warrant denial of the stay.

And so that brings us to why we're here today and the

90

question of whether movants can show that issuing a stay will not substantially injure the debtor. And, again, it is their burden and the case law says that they have to show that there will be no substantial injury to the debtor, and there's no way they made that showing.

If you look at their briefs, the only thing that they included in their briefs was the argument about the condition for the final, non-appealable order. That's gone away now, but that's literally the only thing they have in their briefs on substantial injury to the debtor. You can go back and look at it, that's all that's there.

They came in today with a new argument, and the new argument is that somehow we manufactured the situation and therefore, I guess, the harm that I don't think they're disputing should not warrant the denial of the stay. So they're coming in and basically saying, I guess, there's harm, I haven't really heard dispute of that, but because we supposedly manufactured that harm, you should grant the stay. They cited cases to you that they did not cite in their brief. That's why counsel had to stand up here and read you four case names and case cites. This argument is not in their brief. I haven't been able to look at every single one of the cases, but my suspicion is that they're not even in the context of a motion for stay in a bankruptcy proceeding. I am guessing that most, if not all of them, are in the context of a preliminary

91

injunction.  Now, I say that because the quotes that he was using used the phrase "irreparable injury," which as we know, as I just explained, is not even the standard that we look at to see what the harm to the debtor is.  So, I think they're inapplicable, it's a completely new argument.

And just to hit it on the head, what the debtor has done here and what was proposed to you and what you blessed was a settlement and a proposed sale that was deemed to be in the best interests of the estate to maximize value for all stakeholders, and you blessed that; they might not like that ruling, but you blessed that.  And we now since then have had a full and fair auction where we have a new winning bidder coming in and actually coming in and willing to pay substantially more than even the stalking horse bidder.

So what has happened here is the debtor evaluating strategic alternatives that will maximize value for the estate, the process has played out in a way where it's brought even more finances and value into the estate, or it will once this all closes, and if you impose a stay there will clearly be substantial injury to the estate with that sale not going through, with DIP financing being in jeopardy, jobs being in jeopardy, and everything that you heard today, the parade of horribles that ultimately might lead to a liquidation if we can't have this sale go through.  And, Your Honor, that is not the type of like manufacturing a situation that would warrant

denial of the stay, it's exactly what the debtor and its professionals who are advising it are supposed to be doing in this situation, and it's played out in a way that has provided more benefit to the estate with a new winning bidder.

Thank you, Your Honor.

THE COURT:  Thank you, Ms. Wine.

MR. SMITH:  And, Your Honor, the Tribune case is 799 F.3d 272, and the discussion on the bond requirement is at pin 281.

THE COURT:  Thank you.

MR. HOWARD:  Good afternoon, Your Honor, George Howard, Vinson & Elkins, on behalf of R. T. Vanderbilt Holding. I'll be very brief.  I think Katten and Latham did an excellent job and covered all the points, I join in all those arguments.

Just two things that I guess bother me and I wanted to point out.  One is this idea that the plaintiffs, the committee hasn't had a seat at the table.  I've been asking the committee to engage with us since the day they were involved. I have offered up information, I have offered to explain things so they didn't have to find their way through depositions to get information, they've declined that.  They don't want to engage with us and for them to turn around today and try to use that, weaponize it, and suggest they haven't had a seat at the table is just not true.  And normally I don't talk about settlement discussions, stuff like that, I'm not going to get

93

into any details, but the idea that they've been excluded or blocked out or no one wants to talk to them, I'm the one sitting in the back of the courtroom feeling like no one wants to talk to me.

And just on a couple of the cases they cited, I think we mostly addressed this in our pleadings. Like the Whittaker, Clark doesn't say what they claim it says, and Your Honor can go read it. Same with Kidde-Fenwal. Again, that was an order approving a disclosure statement, it wasn't a ruling on the appropriate standard to apply. And even again today this idea that this has never been done before, that non-debtor assets and debtor assets haven't been marketed together, it took me a while to recall, although it happened just last year, I did a case just like that. I mean, obviously, no case is exactly the same. It was called Danimer Scientific, Brown Rudnick was committee counsel, we had all of our valuable IP in a non-debtor entity and we didn't control it, and we all decided it was best to market them together because you get more value if you put them together and sold it as opposed to separately, and that's what happened. We didn't hear a peep from anybody about a dispute there. And I'm confident, if I went to look, I could find other cases where the same happened.

So, again, I just don't think they're really -- you know, they make these broad statements, right, about things, and I don't think they're always true when you go to look

94

closely at exactly what the cases say or what's out there.

Unless Your Honor has any questions for me about the waiver or anything like that, that's all I had to say today.

THE COURT:  No, I didn't get an opportunity to look at the waiver that was filed.  I did see that it was filed, but we will deal with that tomorrow in the context of the sale.

MR. HOWARD:  Okay.  Thank you, Your Honor.

THE COURT:  Thank you.

Ms. Champion, did you want to be heard before we have a reply?

MS. CHAMPION:  Very briefly, Your Honor, thank you. Erin Champion for the United States Trustee.

Your Honor, the United States Trustee supports the committee's motion to stay pending appeal because it's absolutely necessary to preserve meaningful appellate review of significant issues, as outlined by Mr. Molton.  A stay preserves the status quo pending appellate review and prevents potentially irreversible consequences before appellate courts have had an opportunity to consider the merits of those legal issues.  Those issues, Your Honor -- the issues raised implicate fundamental due process rights, the limits of 9019, and the proper application of Harrington v. Purdue, and most importantly, Your Honor, the integrity of the bankruptcy system, and I would ask that the Court consider those very serious implications in granting the committee's motion.

95

THE COURT:  Thank you.

MS. CHAMPION:  Thank you.

MR. MOLTON:  Judge, I'm not going to argue any legal points, I'm going to rest on the record.  I do want to say that we would have been pleased to give you a reply brief that would have addressed those issues.  So somebody -- you know, they didn't give you those cites, well, we would have in the brief.  We were on an expedited -- we've learned to run expedited in this case.  So, in any event, I tried to give you what a written reply would have looked like here, so that's number one.

Number two, I don't remember saying the Supreme Court put a stake through anybody's heart, but I would you to look at the Caplin case, which is 406 U.S. 416, Justice Marshall, dealing with the predecessor of 544, and it's that case that led Judge Ambro to kind of abandon 544 in terms of that issue.

Lastly, my friend testifying about settlement discussions, completely -- he did it once before, he knows where I am.  We've asked for, as we've done in all the cases when somebody is seeking a release, including the Sacklers, we asked them, we need you guys to give us your financial disclosures, we'll start talking then.  That has gone unanswered.

So, in any event, there you go.

THE COURT:  Mr. Molton --

96

MR. MOLTON: Yes.

THE COURT: -- I'm sorry, I wanted to hear all the arguments before I circle back.

Are you suggesting that I deviate from Kwok's finding, is that -- you put a lot of different -- Purdue and you put out a lot of different circuits' findings that they are -- it's problematic even though Kwok is --

MR. MOLTON: Kwok actually deals with reverse -- what is it -- reverse --

THE COURT: Veil piercing.

MR. MOLTON: -- veil piercing and arguably -- listen, the general principle of Kwok, we basically -- I'm not asking for reconsideration, Judge, I'm not asking you to -- we would have made a reconsideration motion. These are arguments that we're going to be prosecuting running on appeal and, needless to say, one of the things we'll be saying is Kwok, you know, has a further master -- or mistress, and that's the Supreme Court of the United States. And, you know, if you read the case I just gave you, Caplin, and read Justice Ambro, page 35 to 53 on his recent opinion -- you know, he's brilliant, he can say it better than I do why it is that 544, which is the underpinning of Kwok and Nordlicht, is problematic with respect to plaintiff tort claims.

So, I just wanted to raise that. No, we're not asking -- we didn't ask you here to reconsider. What we're

97

saying is we believe, based on what I've told you, that we do have a likelihood of success.  Yes, I used the Second Circuit standard, but I also said plausible likelihood of success on appeal.  And it's my belief that this issue will be fleshed out and I gave you the reasons why, but I think I answered your question.

THE COURT:  You did.

MR. MOLTON:  Okay.

THE COURT:  Thank you, sir.

Is there anyone else who wishes to be heard?

(No audible response)

THE COURT:  Hearing none, the Court is going to take a 15-minute recess, and then we'll come back and decide if I'm going to consider overnight or issue a ruling this afternoon.  Thank you.

THE CLERK:  All rise.  Court will take a brief recess.

(Recess at 4:16 p.m./Reconvened at 4:32 p.m.)

THE CLERK:  All rise.  You may be seated.

THE COURT:  The Court is going to reserve and will issue an oral ruling tomorrow at 10 o'clock, and then we will commence the sale hearing right afer that ruling.

MR. MOLTON:  Thank you, Judge.  I just want to apologize in advance, I cannot be here tomorrow.  So it's going to be in Mr. Jonas' hands and Mr. Self's hands.

98

THE COURT:  Thank you very much.

MS. WINE:  And, Your Honor, just for good measure, I also cannot be here tomorrow, but I don't think I'm critical to tomorrow's motions, I just wanted to let you know.

THE COURT:  Thank you.  I know --

MS. CHAMPION:  And, Your Honor --

THE COURT:  -- that with the teams we will all be in good hands.  Ms. Champion --

MS. CHAMPION:  -- I won't be here either.

THE COURT:  -- is there a party somewhere that I don't know about?

(Laughter)

THE COURT:  Ms. Barbaruolo will be --

MS. CHAMPION:  Yes, Your Honor.

MR. SMITH:  Nor will I, Your Honor.  My colleague Mr. Barnowski will be here.

THE COURT:  I feel like I'm missing something that's fun --

UNIDENTIFIED COUNSEL:  I will be here.

(Laughter)

MS. POSIN:  Your Honor, I was going to say, Kim Posin of Latham & Watkins, proposed counsel for the debtor, and I will be here tomorrow and will be happy to carry on with the sale.

I did want to -- as a housekeeping note, I wanted to

99

kind of give the Court an idea of what we're expecting to see tomorrow.

THE COURT:  Yes.

MS. POSIN:  I know you've seen a flurry of documents that were filed and you're going to see, unfortunately, a couple more.

With respect to the sale we intend to proceed tomorrow, we will have at least one witness.  Mr. Mendelsohn will be taking the stand again and then we'll proceed to argument on that.

With respect to the DIP, as you might have seen, Your Honor, in some of the documents that were filed, the expectation is that the winning bidder will take over the DIP or issue a new DIP, a replacement DIP, I suppose.  We are working on those documents, they are lengthy and time-consuming, and people have been working around the clock to try to get them done.  Our hope and expectation is that we can file a DIP motion today and ask for emergency relief possibly for tomorrow, maybe on Friday, if the Court has time for us.  We really would like to get that replacement DIP in place, an interim order entered, and the original DIP lender taken out essentially by Friday, Monday at the latest.  So that will be coming your way.

I also think there will be some changes to the sale order, going back to the sale for a second, we are working on

100

those changes as well.  We will provide the Court with a redline, it may be at some point this evening, and we would be happy to walk the Court through that redline tomorrow.  I don't think the changes are going to be terribly substantive, but because the winning bidder is not the stalking horse bidder, there were changes that they had, plus we were able to resolve some of the sale objections that were filed with the Court, and that is all in the revised sale order.  So --

THE COURT:  So, emergency DIP overnight, but then that -- because one of the questions that the Court had was Commodore's Friday deadline to issue -- have a sale order entered.  I don't know if it was issued orally or entered, I'm not quite -- I didn't have a chance to circle back to that.  So the replacement DIP with the new stalking horse gets rid of that deadline.  Is there another deadline in the DIP from the stalking horse that I need to be cognizant of?

MS. POSIN:  It might be --

THE COURT:  Meaning between here and Monday.

MS. POSIN:  Well, I think it probably retains -- I think it retains the sale order being issued by May 8th, so Friday, just as the existing DIP does, but I think that's the only near-term deadline in the new DIP that I can recall off the top of my head.  But if I am wrong about that, I will certainly advise the Court tomorrow.  I think that's -- yes?  Okay.

THE COURT:  And with respect to the revised sale order, were you going to file that on a redlined version of that, was that the intention, and perhaps give, again, very briefly, what objections have been resolved so the Court is able to focus on the outstanding issues?

MS. POSIN:  Yes, Your Honor.  If you look at the sale reply that we filed yesterday, Exhibit A, the attachment, has all of the other objections listed out.  There were a couple of -- I think three or four sale order objections, a couple of cure objections.  It lists what the objection was and the resolution.  I think, with respect to the sale order, we've resolved all of those.  I think, with respect to the cures, we're pretty much there, but if we can't resolve them in advance of the hearing tomorrow, the expectation is that we would ask the Court for a separate cure hearing to be dealt with later, we would not be dealing with those tomorrow.

THE COURT:  And has the -- I'm assuming the redline, since that hasn't been negotiated with the new stalking horse, hasn't been shared with the committee yet?  That's a question.

MS. POSIN:  I don't know if you -- have you all seen that?  There's a lot of paper flying around, Your Honor.  We will get you a version, if you haven't seen it yet, we will definitely get that over to them and to Ms. Champion this evening, as well as all the DIP documents as we're getting through them.

102

THE COURT:  Thank you.

Is there anything else the Court needs to be prepared for for tomorrow?

MS. POSIN:  I think that's it.  So, my expectation would be, and maybe it's obvious, that the final DIP hearing with respect to the Commodore DIP would not being going forward because the expectation is the replacement DIP would replace it, take it out.

THE COURT:  And Commodore is -- it's acceptable to Commodore to operate under the existing interim orders and not have any type of a final order for them?

MS. POSIN:  I haven't heard to the contrary.  I don't think they're on the line today --

THE COURT:  I don't think so.

MS. POSIN:  -- but we will confirm that with them.  A lot of moving parts in a very short period of time, but we will confirm that with them that they don't need a final order.  If they think that they do, then we'll come back to the Court with that, but I think we were down to just a few issues with the committee on the DIP.  So maybe we can get those resolved and we could have a final order entered without contest tomorrow, or at least on a very limited basis, limited arguments.

THE COURT:  I would assume if they're getting cash that they don't care about Chapter 5 causes of action and other things like that, so --

103

MS. POSIN:  That's what I would assume --

THE COURT:  -- that would certainly --

MS. POSIN:  -- as well, Your Honor.

THE COURT:  -- certainly make some sense.

Okay.  Thank you very much.

MS. POSIN:  Yes, you're welcome.

THE COURT:  Is there anything from the committee's perspective?

MR. MOLTON:  No, Your Honor.  Thank you.

THE COURT:  Thank you.  So, we will adjourn until 10 o'clock tomorrow, and I look forward to seeing everyone tomorrow.

THE CLERK:  All rise.  Court is adjourned.

(Proceedings concluded at 4:38 p.m.)

* * * * *

104

# C E R T I F I C A T I O N

We, KAREN WATSON and TRACEY WILLIAMS, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.


/s/ Karen Watson

KAREN WATSON


/s/ Tracey Williams

TRACEY WILLIAMS

J&J COURT TRANSCRIBERS, INC.    DATE: May 8, 2026

## **EXHIBIT 2**

### *TEMPORARY RESTRAINING ORDER PENDING ARGUMENT ON THE UNITED STATES TRUSTEE'S MOTION FOR A STAY*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____x

IN RE PURDUE PHARMA L.P, et al.,

        Debtors

_____x

THIS FILING RELATES TO ALL CASES

_____x

21 cv 7532 (CM)
21 cv 7961 (CM)
21 cv 7962 (CM)
21 cv 7966 (CM)
21 cv 7969 (CM)
21 cv 8034 (CM)
21 cv 8042 (CM)
21 cv 8049 (CM)
21 cv 8055 (CM)
21 cv 8139 (CM)

TEMPORARY RESTRAINING ORDER PENDING ARGUMENT ON THE
UNITED STATES TRUSTEE'S MOTION FOR A STAY

McMahon, J.:

The United States Trustee has anticipated by two days one of the items on MY agenda for our conference on Tuesday, that being the question of a stay pending appeal.

This court is all too familiar with the doctrine of equitable mootness as applied in the Second Circuit, as it has upended my ability to decide at least one previous bankruptcy appeal. I am also aware of the fact that the issue is presently under consideration at the United States Supreme Court, which will resolve it one way or the other this term.

I have no intention of allowing the critically important issues on appeal to be "equitably mooted," and I had intended to ask the parties about their views on a stay when we got together. Now that I have a formal motion, I intend to resolve the question ON TUESDAY, with oral argument. As long as I have jurisdiction to enter a stay pending appeal I fully intend to do so, unless some opponent comes up with an argument that I cannot presently anticipate. (though I will listen to what anyone has to say). The stay will be conditioned on adherence to an expedited briefing schedule for the appeal.

I am given to understand that the automatic stay following confirmation has already expired. Accordingly, sufficient cause appearing therefor, I hereby enter this temporary restraining order staying the effectiveness and implementation of the Bankruptcy Court's orders of September 15 and 17, 2021, from which appeals have been taken to this court (the "Advance Order" and the "Confirmation Order," respectively), as well as oral confirmation order dated September 1, 2021, and any other orders of which I might not be aware that are implicated by the pendency of these appeals.

We will take this matter up on the merits on Tuesday.

This order shall be docketed in all pending appeals.

Dated: October 10, 2021

_____
U.S.D.J.

BY ECF TO ALL COUNSEL